**XO COMMUNICATIONS, LLC, Plaintiff,**

**v.**

**LEVEL 3 COMMUNICATIONS, INC., Defendant.**

C.A. No. 2131–VCL.

Court of Chancery of Delaware, New Castle County.

Submitted: July 2, 2007.

Decided: Nov. 2, 2007.

William P. Bowden, Esquire, Philip Trainer, Jr., Esquire, Carolyn S. Hake, Esquire, Ashby & Geddes, Wilmington, Delaware; John P. Corrado, Esquire, John A. Trocki, III, Esquire, Ana–Maria Ignat, Esquire, Morrison & Foerster, LLP, Washington, D.C., Attorneys for the Plaintiff.

Thomas P. Preston, Esquire, Elizabeth A. Wilburn, Esquire, Blank Rome LLP, Wilmington, Delaware; Stanley L. Garnett, Esquire, Jeanine M. Anderson, Esquire, Christopher C. Zenisek, Esquire, Brownstein Hyatt Farber Schreck, P.C., Denver, Colorado, Attorneys for the Defendant.

## OPINION

LAMB, Vice Chancellor.

In 1998, two companies agreed to collaboratively develop a fiber optics network. One company agreed to lay the fiber network while a second company purchased an indefeasible right of use in part of that network. Over a period of years, they modified the original agreement and entered into new, related contracts. The dispute before this court arises from those changes, specifically a contract by which the second company agreed to purchase its "requirements for wavelength services" from company one.

The question presented is whether the second company gave up the right to use the asset it purchased by later agreeing to purchase from company one its requirements of the very goods or services capable of being produced by that asset. The court concludes that, unless the contracts themselves evince an intent to limit the second company's right to use the asset it purchased, there is no basis for a finding that second company's continued use of that asset constitutes bad faith or amounts to a breach of contract.

## I.

Plaintiff XO Communications, LLC is a Delaware corporation with its principal place of business located in Reston, Virginia. XO is a national local exchange carrier that provides voice and data communications services to businesses, agents, and carriers. XO's voice offerings include local and long distance services, collocation, and voice response systems. Its data offerings include internet access, private data, networking and network security systems, and hosting.

Defendant Level 3 Communications, Inc. is a Delaware corporation with its principal place of business located in Broomfield, Colorado. Level 3 is an international communications and information services company offering communication services over its broadband fiber-optic network, including internet protocol services, broadband transport, collocation services, managed modem services, and voice services.

In 1998, Level 3 was in the process of constructing approximately 19,600 route miles of optical fiber. Around the same time, Internext, LLC, the predecessor company of XO Intercity Holdings No. 2 ("XOIH2"), which is itself a subsidiary of

XO Communications, LLC,[1] wished to obtain rights of use and control in a network of optical fiber.[2] Realizing they could achieve their respective goals more efficiently if they worked together, Level 3 and Internext entered into the Cost Sharing and IRU Agreement (the "CSIRU") on July 18, 1998.[3]

Under the CSIRU, Level 3 agreed to lay optical fiber across North America, and construct buildings to house the equipment used to light the fiber.[4] Level 3 also agreed to provide the power necessary to run that equipment and to perform all maintenance required on the fiber.[5] In return, XO agreed to pay Level 3 $700 million for the right to use 24 conduit-protected fibers and one spare conduit in North America,[6] and to install the machines to "light" its fiber.[7] XO also agreed to pay monthly recurring charges for

1. The record is unclear as to when XOIH2 and XO acquired Internext and succeeded its interest in the contract rights at issue here. However, this fact is unimportant for resolution of the motion for summary judgment.

2. A fiber optic network sends information over long distances in the form of beams, or wavelengths, of light. First, a machine converts data, such as an email, into a wavelength of light. This wavelength is then beamed down an optical fiber towards its final destination. Along the way, the light must be reamplified, and there are machines for that purpose. When the wavelength of light reaches its destination, yet another machine converts the light into usable digital information. Depending on the sophistication of the equipment involved, an optical fiber can transmit a wavelength of light containing, for example, 2.5GB or 10GB of data.

3. *See* CSIRU Recital D ("Grantor [Level 3] and Grantee [XO] can complete their desired networks less expensively if such networks are constructed as part of a single project than if each network were constructed independently.").

4. Section 8.02 states: "Grantor will provide Regeneration Facilities and Opamp Facilities to be located along the Grantor System...." Section 10.01 provides that "Grantor shall provide Grantee with access to, and Grantee shall have the right to interconnect with, the Grantee Fibers and the Grantee Conduit at Segment End Points...." Section 10.04 provides: "Grantee shall have access to the Regeneration Facilities and Opamp Facilities 24 hours per day, 7 days per week...." Section 10.06 states: "Grantor shall (i) make available to Grantee such dedicated space and amenities (e.g., power, caging, lighting, etc.) in Regeneration Facilities and Opamp Facili-

ties as is necessary to light the Initial Grantee Fibers...." Section 10.08 states: "The IRU granted hereunder shall include Grantee's right to install equipment or replace existing equipment, in the space located at the Opamp Facilities and Regeneration Facilities made available to Grantee pursuant to this Agreement."

5. Section 12.01 states that "all scheduled maintenance of the Grantee Fibers and/or Grantee Conduit shall be paid by Grantor; provided, however, that Grantee shall reimburse Grantor for its proportionate share of costs ... of any unscheduled maintenance and repair...."

6. Section 11.01 of the CSIRU states that "Grantee shall have full and complete control and responsibility for determining all matters with respect to the use of the Grantee Fibers and the Grantee Conduit...." Section 3.01 of the CSIRU states that "Grantee hereby acquires from Grantor for the purposes described herein (i) an exclusive indefeasible right of use in ... twenty-four (24) fibers ... [and] (ii) an exclusive indefeasible right of use in ... one specifically identified unoccupied conduit...." Section 15.02 states that "Grantee may use the Grantee Fibers, the Grantee Conduit, and the IRU for any lawful purpose."

7. Section 11.02 states that "Grantor is not supplying nor is Grantor obligated to supply to Grantee any optronics or electronics or optical or electrical equipment or other facilities, all of which are the sole responsibility of Grantee...." Section 10.08 states that "[t]he IRU granted hereunder shall include Grantee's right to install equipment or replace existing equipment, in the space located at the Opamp Facilities and Regeneration Facilities

maintaining and operating XO's fiber.[8]

In late 2000, the telecommunications industry began encountering significant financial difficulties. As a result of these difficulties, Level 3 and XO restructured their relationship by entering into two new agreements on April 25, 2001. The first of these was the Definitive Agreement, which rescinded a previous agreement between XO and Level 3 called the Europe IRU Agreement.[9] Level 3 also agreed to purchase from XO transmission equipment that XO itself had recently purchased from Ciena Corporation. In payment, Level 3 granted to XO a credit in the same amount for the purchase of "wavelength services." XO then immediately used much of this credit to purchase "two 10 Gbps wavelengths across Level 3's entire North America network." [10]

The second agreement XO and Level 3 entered into on April 25, 2001 was the Master Wavelengths Agreement (the "Wavelengths Agreement"). The Wavelengths Agreement provided XO the opportunity to purchase specific wavelengths of light, or "capacity," from lit fiber along Level 3's networks in North America and Europe, and fixed pricing for that capacity.[11] Neither the Definitive Agreement nor the Wavelengths Agreement rescinded the CSIRU.

On October 30, 2001, XO and Level 3 executed the Workout Agreement to clarify which equipment Level 3 had purchased, and how much credit Level 3 had issued to XO. Specifically, Level 3 and XO agreed in section 3 that XO would retain Ciena transmission equipment it owned along routes in the San Francisco Bay area. In section 7 of the Workout Agreement, Level 3 granted XO an additional $3 million in credit for "future incremental Wavelengths purchases ... pursuant to the Wavelengths Agreement." [12]

---

made available to Grantee pursuant to this Agreement."

8. Section 13.01 states: "Grantor shall be responsible for the payment of all costs and expenses relating to the Grantor System, including, without limitation ... (ii) the costs of constructing and maintaining the Grantor System, [and] (iii) all charges and expenses (including utility charges) associated with operation of the Regeneration Facilities and Opamp Facilities...." Section 13.02 states that "[i]n consideration of Grantor's responsibilities in Section 13.01 and otherwise under this Agreement ... Grantee shall pay to Grantor each year, with respect to each segment ... the following sums (the "Recurring Charge")...." A major component of the Recurring Charge is the "Operating Expense Charge," which section 13.05 explains is based on an estimate of Level 3's actual expenses incurred in operating and maintaining XO's fiber.

9. Under the Europe IRU Agreement, XO subsidiaries purchased rights in European fiber from Level 3 subsidiaries. At the time of entry into the Definitive Agreement XO had

paid $128.6 million on the Europe IRU Agreement. Because the Definitive Agreement rescinded the Europe IRU Agreement, this amount was credited to payments XO owed Level 3 under the CSIRU. Level 3 and XO agreed that this credit, plus the $380.5 million XO had already paid under the CSIRU before entry into the Definitive Agreement, and an additional $60.8 million XO paid on April 25, 2001, brought XO's remaining balance for fiber purchased under the CSIRU to $122.6 million.

10. Definitive Agmt. § 6. Section 5(c) of the Definitive Agreement states that this purchase, and any future purchases utilizing XO's credit, were to be made pursuant to the terms of the Master Wavelengths Agreement and the Definitive Agreement. Any remaining credit not spent by the eighth anniversary of the Definitive Agreement was to be forfeited. XO and Level 3 signed the Definitive Agreement in its entirety, and XOIH2 signed as to the CSIRU provisions.

11. *See* Wavelengths Agmt. Art. 1.5.

12. Workout Agmt. § 7.

XO continued to have financial difficulties, and ultimately declared bankruptcy. On August 8, 2002, in connection with XO's bankruptcy, the parties entered into yet another agreement, the Master Agreement, to restructure their relationship. The Master Agreement was an umbrella agreement, having as exhibits four proposed amendments to the agreements outlined above to be signed after XO received Chapter 11 bankruptcy court approval.[13]

Exhibit D to the Master Agreement is the First Amendment to the Workout Agreement (the "First Amendment"), executed on February 11, 2003 between XO and Level 3. The First Amendment contains the purchase requirements language that is the focus of this dispute (the "Clause"). The Clause states, in part: "XO hereby agrees to purchase all of its requirements for wavelength services ... exclusively from Level 3."[14]

In August 2003, shortly after executing the First Amendment, XO began lighting segments of fiber it had acquired under the CSIRU. In or around October 2004, Level 3 informed XO that it considered XO's lighting of fiber acquired under the CSIRU to be improper "self-provisioning" of wavelength services, bad faith, and a breach of the Clause.

## II.

 On May 5, 2006, XO filed its initial complaint for declaratory judgment, injunctive relief, and specific performance. XO filed an amended complaint on July 11, 2006.[15] That complaint seeks a declaration of XO's rights under the CSIRU, specifically that the First Amendment does not, in any way, modify, alter, terminate, or suspend the rights XO acquired under the CSIRU to light fiber acquired from Level 3, or to provide, for its own purposes or to third parties, wavelength services utilizing such fiber.[16] The complaint also seeks

**13.** Exhibit A to the Master Agreement is the Third Amendment to the CSIRU, executed on February 11, 2003, in which among other things, Level 3 agreed to reduce the recurring charge XOIH2 owed Level 3 for maintenance of the fiber it obtained under the CSIRU, while XOIH2 agreed to surrender six fibers to Level 3. Exhibit B to the Master Agreement is an amendment to an agreement called the National Master Communications Service Agreement, which is not at issue in this litigation. Exhibit C to the Master Agreement, executed on February 11, 2003, is the Third Amendment to the Master Wavelengths Agreement which clarifies the purpose of the PO & M Charge, and reworks the amount of XO's credit that remained from its sale of the Cienna equipment.

**14.** The Clause states in full: "XO hereby agrees to purchase all of its requirements for wavelength services within the United States and Europe exclusively from Level 3 for a period of five (5) years (subject to Level 3 providing competitive pricing and other terms and conditions and having capacity available to meet XO's requirements). Level 3 shall waive its rights to exclusivity and XO shall be permitted to purchase wavelength services from other carriers without violating this Section if (a) Level 3's pricing increases over Level 3's current pricing, or (b) XO purchases such services from a reputable carrier at a price with associated service level agreements ("SLAs") which (after providing Level 3 the opportunity to meet or beat such pricing and beat or meet such SLAs) is less than the price with comparable SLAs offered by Level 3, or (c) XO is procuring such wavelength services for the purpose of providing services which are route diverse from existing wavelength services purchased from Level 3, and Level 3 is unable to provide such diversely routed wavelength services. The foregoing provisions regarding exclusivity shall not be construed as limiting the parties' current agreements regarding wavelength pricing and SLAs set forth in the Wavelength Agreement."

**15.** The amended complaint is the operative complaint for purposes of this opinion.

**16.** Four elements must be met for the court to consider a controversy suitable for declaratory judgment: (1) the controversy must involve a claim of right or other legal interest of the

permanent injunctive relief preventing Level 3 from refusing to cooperate with XO's utilization of fiber it acquired under the CSIRU, preventing Level 3 from interfering with XO's business and business expectancies, and requiring Level 3 to provide all necessary services for XO's use of that fiber. Finally, the complaint seeks an order directing Level 3 to specifically perform its duties and obligations under the CSIRU.

On January 18, 2007, after the parties engaged in written discovery, Level 3 filed its motion for summary judgment. XO filed its opposition and cross-motion for summary judgment on February 23, 2007.

## III.

To prevail on summary judgment, the moving party must "demonstrate that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." [17] "The court must view the evidence presented in the light most favorable to the non-moving party, and the

moving party bears the burden of demonstrating the absence of a material factual dispute." [18] Once the moving party has demonstrated such facts, and those facts entitle it to summary judgment, the burden shifts to the non-moving party to present "specific facts showing that there is a genuine issue of fact for trial." [19] The non-moving party "may not rest upon the mere allegations or denials [contained in the pleadings]." [20]

The mere existence of cross-motions does not necessarily make summary judgment for either party inappropriate, nor does it change the standard for summary judgment.[21] Rather, the court examines each motion separately,[22] and "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law, then summary judgment is appropriate." [23]

party seeking declaratory relief; (2) the claim of right or other legal interest must be asserted against one who has an interest in contesting the claim; (3) the conflicting interest must be real and adverse; and (4) the issue must be ripe for judicial determination. *Mehiel v. Solo Cup. Co.*, No. 851–N, 2005 WL 1252348, at *4 (Del.Ch. May 13, 2005). Because of the dispute concerning XO's alleged right to light its own fiber, XO has been limited in its ability to conduct its business of providing wavelength services to third parties. Compl. ¶¶ 13–17. This dispute is therefore suitable for declaratory judgment. *Id.* at *4.

17. *Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 219 (Del.Ch.2007).

18. *Id.*

19. *Id.* (citing Court of Chancery Rule 56(e)).

20. *Id.* (citing Court of Chancery Rule 56(e)).

21. *See Mehiel*, 2005 WL 1252348, at *3; *United Vanguard Fund, Inc. v. Takecare, Inc.*, 693 A.2d 1076, 1079 (Del.1997).

22. *See Union Oil Co. of Calif. v. Mobil Pipeline Co.*, No. 19395, 2006 WL 3770834, at *9 (Del.Ch. Dec.15, 2006).

23. *Mehiel*, 2005 WL 1252348, at *3; *see also Rochester v. Katalan*, 320 A.2d 704 (Del.1974); *Levy*, 924 A.2d at 219; *Fasciana v. Electronic Data Sys. Corp.*, 829 A.2d 160, 166–67 (Del. Ch.2003). The court notes that the filing of cross-motions sometimes triggers Court of Chancery Rule 56(h). That rule treats cross-motions for summary judgment as a stipulation for decision on the merits based on the record submitted. In this case, however, each party argues that material factual issues exist that preclude summary judgment in the other's favor. XO argues that an issue of fact exists as to whether Level 3 waived its right to object to XO's self-lighting, and whether its self-lighting falls within exception to the Exclusive Purchase Clause. *See* Pl.'s Opp. 31. Level 3 argues that if the court finds the Clause is ambiguous, there are issues of fact warranting additional discovery. Def.'s Supp. Br. 21. "Because both sides have alleged that there are outstanding issues of fact

## IV.

 While Delaware law governs the procedural aspects of this case, New York law governs the interpretation of the contract itself.[24] Under New York law, the court looks to the plain meaning of its terms when interpreting a contract.[25] " '[E]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.' "[26] Only if the document is ambiguous will the court resort to extrinsic evidence to interpret the meaning of the contract.[27] Still, "[t]echnical words [in an unambiguous contract] are to be interpreted as usually understood by the persons in the profession or business to which they relate, and must be taken in the technical sense unless the context of the instrument or an applicable usage or the surrounding circumstances clearly indicate a different meaning."[28] Further, "when interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties, to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."[29] Similarly, a "contract should not

material to the resolution of the other's motion, Rule 56(h) does not apply by its own terms." *Chambers v. Genesee & Wyoming, Inc.*, 2005 WL 2000765, at *5 n. 21 (Del.Ch. Aug.11, 2005).

24. "As a general proposition, Delaware courts will recognize and enforce contractual choice-of-law provisions if the selected jurisdiction has a material connection with the transaction." *Trilogy Dev. Group, Inc. v. Teknowledge Corp.*, No. 09–158, 1996 WL 527325, at *3 (Del.Super.1996) (citing *Falcon Tankers, Inc. v. Litton Systems, Inc.*, 300 A.2d 231, 235 (Del.Super.1972)). The current dispute involves interpretation of several agreements providing that New York law governs disputes resulting therefrom. Also, at least a portion of the optical fiber at issue in this case is located in New York. New York law thus governs interpretation of this contract. Procedural matters, however, are determined by Delaware law. *See, e.g., Taylor v. LSI Logic Corp.*, No. 13915, 1998 WL 51742, at *4 n. 19 (Del.Ch. Feb.3, 1998); *Lutz v. Boas*, 176 A.2d 853, 857 (Del.Ch.1961) ("It is well established that the law of the forum governs questions of remedial or procedural law.").

25. *See, e.g., CanWest Global Commcn's Corp. v. Mirkaei Tikshoret Ltd.* 9 Misc.3d 845, 804 N.Y.S.2d 549, 568 (2005); *Von Steen v. Musch*, 3 Misc.3d 207, 776 N.Y.S.2d 170, 175 (N.Y.2004); *Milonas v. Public Employ. Reltn's Bd.*, 225 A.D.2d 57, 648 N.Y.S.2d 779, 784 (1996); *Fed. Deposit Ins. Corp. v. Herald Sq. Fabrics Corp.*, 81 A.D.2d 168, 439 N.Y.S.2d 944, 952 (1981).

26. *Great South Bay Family Med. Practice, LLP v. Raynor*, 35 A.D.3d 808, 826 N.Y.S.2d 729, 731 (N.Y.App.Div.2006) (collecting citations); *see also, e.g., Mercury Bay Boating Club, Inc. v. San Diego Yacht Club*, 76 N.Y.2d 256, 557 N.Y.S.2d 851, 557 N.E.2d 87, 93 (1990); *Milonas*, 648 N.Y.S.2d at 784; *Fed. Deposit*, 439 N.Y.S.2d at 952.

27. *See South Road Assoc., LLC v. Int'l Bus. Machs., Corp.*, 4 N.Y.3d 272, 793 N.Y.S.2d 835, 826 N.E.2d 806, 809 (2005); *Mercury Bay*, 557 N.Y.S.2d 851, 557 N.E.2d at 93; *Milonas*, 648 N.Y.S.2d at 784. Under New York law, "[a]mbiguous language is that which suggests 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *E.R. Squibb & Sons Inc. v. Lloyd's & Co.*, 241 F.3d 154, 174 (2d Cir.2001) (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

28. *Hatch v. NYCO Minerals, Inc.*, 245 A.D.2d 746, 666 N.Y.S.2d 296, 298 (1997).

29. *T.M. Bier & Assoc., Inc. v. Piraino*, 16 A.D.3d 578, 790 N.Y.S.2d 884, 884–85 (2005) (citing *John E. Andrus Mem. Home v. DeBuono*, 260 A.D.2d 635, 688 N.Y.S.2d 687, 688 (1999)).

be interpreted in such a way as would leave one of its provisions substantially without force or effect." [30]

 The court also does not review clauses of the document in isolation. To the contrary, interpretation of the language's plain meaning requires that the language be considered within the context in which the parties wrote it.[31] As the New York Court of Appeals explained:

> Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish. The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.[32]

 In this case, the context includes all of the agreements outlined above. Not only do these agreements provide the proper context for interpreting the Clause, but, under New York law, multiple agreements may be read as one contract if the parties so intended.[33] As the parties seem to agree,[34] the CSIRU, Workout Agreement, Definitive Agreement, Wavelengths Agreement, Master Agreement and amendments to each document are all part of one agreement.[35] With these agreements in mind, the court now turns to the parties' positions.

Level 3 argues that a buyer in a requirements contract may not produce for itself what it obligates itself to purchase in the requirements contract. In support, Level 3 cites to *Empire Gas Corporation v. American Bakeries Company*[36] and *Honeywell International, Inc. v. Air Products & Chemicals, Inc.*[37] Level 3 concludes that XO agreed in the Clause to purchase all its requirements for wavelengths from Level 3, and, therefore, cannot light fiber acquired under the CSIRU without breaching the First Amendment.

---

30. *Id.* at 885.

31. *See Bates Adver. USA, Inc., v. McGregor*, 282 F.Supp.2d 209, 215 (S.D.N.Y.2003); *In re Dalow Indus., Inc.*, 333 B.R. 640, 642 (Bankr. E.D.N.Y.2005); *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 450 N.Y.S.2d 460, 435 N.E.2d 1075, 1078 (1982).

32. *William C. Atwater & Co. v. Panama RR Co.*, 246 N.Y. 519, 159 N.E. 418, 419 (1927); *see also South Road*, 793 N.Y.S.2d 835, 826 N.E.2d at 809; *Milonas*, 648 N.Y.S.2d at 784.

33. *See Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir.2006) (applying New York law).

34. *See* Def.'s Supp. Br. 13–14.

35. *See Arciniaga*, 460 F.3d at 237 (interpreting multiple agreements as one contract where, as here, all the agreements involved the same parties, referred to one another, were mutually dependent, and shared the same purpose); *see also Creative Waste Mgt. v. Capitol Envtl. Serv., Inc.*, 429 F.Supp.2d 582, 602 (S.D.N.Y.2006) ("Under New York law, 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'") (quoting *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir.1996)); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 36 N.E.2d 106, 110 (1941) ("It must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid.").

36. 840 F.2d 1333, 1335 (7th Cir.1988).

37. 858 A.2d 392, 396 (Del.Ch.2004), *aff'd*, 872 A.2d 944 (Del.2005).

XO responds, however, that the Clause requires it to buy wavelength services from Level 3, that the term "wavelength services" refers only to wavelengths provided by a third party (not any and all wavelengths), and that it needs wavelength services only when it cannot utilize fiber already acquired from Level 3 under the CSIRU, including previously "dark," or unlit, fiber. Under XO's reading, then, the Clause does not obligate XO to purchase all of its requirements for all wavelengths from Level 3, and, even under *Empire Gas* and *Honeywell,* it can continue lighting fiber acquired under the CSIRU without breaching the First Amendment.

 Level 3 is correct that the Clause is a requirements contract.[38] However, Level 3's argument that *Empire Gas* and *Honeywell* control the outcome of this action is incorrect. In *Empire Gas,* American Bakeries, seeking to convert its fleet of delivery trucks from gasoline to propane, entered into a contract with Empire Gas requiring it to purchase three thousand "conversion units," "more or less depending upon [American Bakeries' requirements]...."[39] American Bakeries later changed its mind about the project and purchased only 229 units and Empire Gas sued for breach of contract, a claim governed by UCC § 2–306(1). Relying on the Official Comments to the UCC, Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit stated that a buyer may "reduce his requirements to zero if he [is] acting in good faith...."[40] "The essential ingredient of good faith in the case of the buyer's reducing his estimated requirements is that he not merely have had second thoughts about the terms of the contract and want to get out of it."[41] Of particular relevance to Level 3's self-provisioning argument, Judge Posner then noted, in dictum, that a buyer will be found to have acted in bad faith if, "during the contract period[, the buyer] ... made its own units, or reduced its purchases because it wanted to hurt [the seller] (for example because they were competitors in some other market)."[42]

This court reached a similar conclusion in *Honeywell,* and held that a buyer acts in bad faith by self-provisioning where it simply no longer likes the contract's terms.[43] In *Honeywell,* Air Products and Honeywell formed a joint venture wherein Air Products promised that the joint venture would purchase its requirements for certain wet chemicals from Honeywell. Air Products ultimately became disenchanted with the joint venture and then purchased from one of Honeywell's competitors a factory able to make the same wet chemicals. After it purported to terminate the joint venture, Air Products began supplying its own needs for wet chemicals from that facto-

---

38. *See, e.g., Abrasive–Tool Corp. v. Cystic Fibrosis Found.,* No. 88–1314, 1991 WL 97445, at *4 (W.D.N.Y. May 6, 1991) (stating "[a] requirements contract exists where the buyer agrees to purchase his requirements '... exclusively from the other party to the contract.'") (applying New York law) (quoting *Embedded Moments, Inc. v. Int'l Silver Co.,* 648 F.Supp. 187, 192 (E.D.N.Y.1986)). The contract language in this case is almost exactly the same.

39. 840 F.2d at 1335.

40. *Id.* at 1338.

41. *Id.*

42. *Id.* at 1339.

43. *See Honeywell,* 858 A.2d at 396; *See also, e.g., Brewster of Lynchburg, Inc. v. Dial Corp.,* 33 F.3d 355 (4th Cir.1994); *Medinol Ltd. v. Boston Scientific Corp.,* 346 F.Supp.2d 575 (S.D.N.Y.2004); *Embedded Moments,* 648 F.Supp. 187; *but see Indiana–American Water Co. v. Seelyville,* 698 N.E.2d 1255 (Ind.App. 1998).

ry.[44] The court concluded that Air Products acted in bad faith and "breached its contractual obligations to Honeywell by turning its back on its duty to buy all of its requirements . . . from Honeywell."[45]

This case is starkly different from *Empire Gas* and *Honeywell.* In those cases, at the time the requirements contract was entered into, the buyer had no ability to produce the required goods. That is, the buyer had no capacity to self-provision and the contract clearly contemplated that the buyer would purchase all of its requirements under the contract. In this case, by contrast, XO held the indefeasible right to use 18 fibers on Level 3's network and, under the CSIRU, had the explicit right to produce wavelengths along those fibers. Indeed, Level 3 had correlative duties to provide power and access to allow XO to exercise those rights, and it was integral to the fulfillment of the cost-sharing purpose of the CSIRU that XO actually light its fiber. For this reason, XO's "requirements" for wavelength services at the time the Clause was signed must be understood in the context of XO's ability to self-provision, using the assets it purchased from Level 3 and continued to own. That is, there is simply no reason evident from the parties' overall relationship to regard XO's continued exploitation of its own assets as an act of bad faith.

The parties could, of course, have agreed otherwise, but Level 3 has not, and cannot, identify any language in the Defin-

itive Agreement, Wavelengths Agreement, Workout Agreement, Master Agreement, or First Amendment that alters the basic structure of the CSIRU or limits in any way or for any period of time XO's ability to make use of its fibers during the life of the requirements contract.[46] This is so despite the fact that the parties were fully familiar with the CSIRU when they negotiated the Clause and could easily have structured a requirements clause that prevented XO from self-provisioning. *Medinol v. Boston Scientific* provides a useful example of a contract between competitors that explicitly limits self-provisioning.[47] In *Medinol,* Boston Scientific manufactured and distributed heart stents but, nevertheless, agreed to purchase its requirements for heart stents from Medinol, a competitor. The contract explicitly limited Boston Scientific's ability to continue manufacturing its own heart stents.[48] Not surprisingly, the court held that Boston Scientific acted in bad faith and breached the contract by continuing to manufacture heart stents in partial satisfaction of its requirements.

Here, the parties clearly knew how to amend the CSIRU explicitly.[49] The fact that they did not do so must foreclose any argument that the First Amendment and its Clause can be construed as implicitly limiting or rescinding XO's rights under that agreement, rights XO purchased *from Level 3* for several hundred million dollars and never expressly surrendered.[50]

---

44. *See Honeywell,* 858 A.2d at 396.

45. *Id.*

46. The Workout Agreement, for example, specifically contemplates that XO would continue lighting certain parts of its fiber along routes in the San Francisco Bay area. *See* Workout Agmt. § 3(c).

47. 346 F.Supp.2d 575.

48. *See id.* at 584 (noting the requirements contract permitted Boston Scientific to sell and manufacture its own heart stents only if there was a "material non-acceptance" of Medinol stents in the marketplace).

49. *See* Exhibit A to the Master Agreement (returning to Level 3 six fibers XOIH2 obtained under the CISRU).

50. Level 3 argues that it could not have accomplished all it wanted by amending the

The conclusion that XO's self-provisioning is not a breach of contract and does not fall within the holdings of *Empire Gas* and *Honeywell* finds added support in the language of the Clause. The Clause requires XO to purchase from Level 3 its requirements for "wavelength services"— not "wavelengths." "Services," by definition, means the provision of something to another, not oneself.[51] Thus, when XO utilizes its fiber to transmit information, XO is not satisfying any requirement of its own for "wavelength services."[52] Instead, it is providing to itself "wavelengths." The distinction is important because XO did not agree to purchase all of its requirements for wavelengths in general from Level 3. Rather, XO agreed to purchase its requirements for something much more specific: the provision of wavelengths to XO by a third party. Because XO requires wavelengths provided by a third party only when XO cannot produce the wavelengths itself, it does not act in bad faith or breach the Clause when it lights fiber it acquired under the CSIRU to satisfy its demand for wavelengths.[53]

■ The court also disagrees with Level 3's interpretation of the waiver provision in the Clause to foreclose self-provisioning. The waiver provision in the Clause says Level 3 waives its right to be XO's exclusive provider of wavelength services if another provider offers XO a lower price than Level 3 is willing to meet. However, the waiver provision does not mention what happens if XO decides to light its

---

CSIRU because XO was not a party to the CSIRU, and the CSIRU only covered fiber in North America, not Europe. Level 3 does not explain, however, why the parties could not amend the CSIRU and then, as they routinely did, execute similar agreements covering the remaining objects of concern.

51. *See, e.g.,* WEBSTER'S NEW WORLD DICTIONARY 1226 (3d ed.1988) (defining "service" as "work done ... for others"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2075 (3d ed.1993) (defining "service" as "the performance of work commanded or paid for by another" and "an act done for the benefit or at the command of another"); THE CONCISE OXFORD DICTIONARY 1266 (9th ed.1995) (defining "service" as "the act of helping or doing work for another").

52. In fact, the English language has a specific word for providing services to oneself: self-service. Level 3 argues that dictionaries define "service" to include "self-service." In support, Level 3 cites to Black's Law Dictionary's definition of "service" as "an intangible commodity in the form of human effort, such as labor, skill, or advice," and argues that XO provides an "intangible commodity" to itself by self-provisioning wavelengths. *See* BLACK'S LAW DICTIONARY 1372 (7th ed.1999). Level 3 also cites to Webster's New World Dictionary's definition of "service" as "a system or method of providing people with the use of something ..." in support of its position. *See* WEBSTER'S NEW WORLD DICTIONARY 1301 (2d ed.1984).

Level 3 is incorrect. First, Black's Law Dictionary defines "commodity" as an "article of trade or commerce," *i.e.*, something purchased. *See* BLACK'S LAW DICTIONARY 267 (7th ed.1999). But when XO provides itself wavelengths, there is no "trade" or "commerce" going on; XO does not purchase those wavelengths. *See Chronister Oil Co. v. Unocal Ref. & Mktg.*, 34 F.3d 462, 465 (7th Cir.1994) ("You can't 'purchase,' whether in ordinary language or in UCC speak, what you already own.") (citation omitted). Therefore, XO does not provide itself an "intangible commodity" by self-provisioning wavelengths. Second, Level 3 misreads Webster's New World Dictionary definition of "service," which is more clearly read as "a system or method of providing [other] people with the use of something...."

53. Level 3 also argues that the parties used the terms "wavelength services" and "wavelengths" interchangeably in the Wavelengths Agreement and the Definitive Agreement. Level 3 is correct that these agreements sometimes refer to "wavelengths" and sometimes to "wavelength services," but ignores that the term "wavelengths" has a very specific meaning in these agreements—wavelengths provided by another (Level 3).

own fiber. Level 3 argues this language is omitted because the parties contemplated that XO was not allowed to light its own fiber, and therefore the waiver provision need not contemplate this scenario. But "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." [54] Under Level 3's interpretation, the waiver provision allows XO to buy wavelengths from someone other than Level 3 (because they offered a cheaper price than Level 3), but prohibits XO from producing wavelengths itself in any situation. Level 3 offers no explanation for why the parties would structure the First Amendment such that XO is permitted to purchase wavelength services from providers other than Level 3, but forbidden to light and use the fibers it bought from Level 3.

The better interpretation of the waiver provision is that XO retained its right to light fiber acquired under the CSIRU, and that the requirements obligation is triggered only where XO cannot use its own fiber, but instead needs to purchase wavelength services from another network. This reading confirms the court's conclusion that the parties intended the Clause to govern only XO's requirements for wavelength services provided by third parties, not all wavelengths.

Finally, Level 3 characterizes the court's interpretation as somehow allowing XO to choose its requirements, rendering the Clause unenforceable for lack of mutuality. This characterization is incorrect. First, by Level 3's own admission, the Clause applies to XO's business in Europe. Because XO gave up its rights to fiber in Europe when it agreed to rescind the Europe IRU Agreement, XO must use a third party's wavelength services in order to serve its European clients. Surely the Clause provides Level 3 important rights in that situation. Second, XO identifies other situations in which it has requirements for services, and it has no control over when those situations arise.[55] As one example, a particular project is either economically feasible, i.e. profitable, when XO lights its own fiber or it is not. If it is unprofitable for XO to light its own fiber in response to an order for wavelength services, XO must purchase wavelength services from Level 3 to fill the order. Level 3 has to trust that XO does the profit calculation correctly, but this is not the same as allowing XO free reign in its decision making (nor is bad faith in that regard alleged). This mutuality of obligation preserves the Clause.[56]

54. *Superb Gen. Contracting Co. v. New York,* 39 A.D.3d 204, 833 N.Y.S.2d 64, 67 (2007).

55. Those circumstances are (1) where XO does not have fiber capacity where service is requested; (2) where the customer has requested route diversity and XO cannot provide it; and (3) where it is economically or temporally unfeasible for XO to provide services on its own fiber. *See* Pl.'s Reply Br. 22; Affidavit of Randolph C. Nicklas ¶¶ 14–15.

56. The court in *James Mason v. United States,* 615 F.2d 1343, 1346 n. 5 (Ct.Cl.1980) explained:

An indefinite quantities contract is a contract under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller. It differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his requirements from the seller. Under an indefinite quantities contract, even if the buyer has requirements, he is not obligated to purchase from the seller. In an indefinite quantities contract, without more, the buyer's promise is illusory and the contract unenforceable against the seller.

(citing *Willard, Sutherland, & Co. v. United States,* 262 U.S. 489, 493, 43 S.Ct. 592, 67 L.Ed. 1086 (1923)).

The court finds that the Clause is unambiguous and does nothing to alter XO's rights under the CSIRU. Summary judgment is particularly appropriate in a dispute over an unambiguous contract "because there is no need to resolve material disputes of fact."[57] Therefore, the requirements of Court of Chancery Rule 56(c) are met, and this dispute may be resolved in favor of XO on the record before the court.[58]

## V.

For the reasons stated above, XO's request for a declaration that the First Amendment to the Workout Agreement does not, in any way, modify, alter, terminate, or suspend the rights XO acquired under the CSIRU to light fiber acquired from Level 3, or to provide, for its own purposes or to third parties, wavelength services utilizing such fiber is GRANTED. Concomitant with this declaration is Level 3's obligation to perform under the CSIRU, including but not limited to providing XO the power and access XO needs in order to continue lighting fiber it purchased under the CSIRU. Counsel for XO shall submit a form of Order and Final Judgment in conformity with this opinion within 10 days, on notice.

---

57. *NBC Universal, Inc. v. Paxson Commcn's Corp.*, No. 650–N, 2005 WL 1038997, at *5 (Del.Ch. Apr.29, 2005); *see also Alexander & Alexander Serv., Inc. v. Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir.1998).

58. Although XO argued in its motion for summary judgment that the Clause was ambiguous, the court may still grant summary judgment in favor of XO, and against Level 3, because the clause is unambiguous. *See Stroud v. Grace*, 606 A.2d 75 (Del.1992) (noting that, in the interests of judicial economy, the court may grant summary judgment *sua sponte*).