**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

BONNIE W. DAVID
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Date Submitted: February 25, 2026
Date Decided: March 10, 2026

Paul D. Brown, Esq.
Joseph B. Cicero, Esq.
Samantha Callejas, Esq.
Chipman Brown Cicero & Cole, LLP
1313 N. Market St., Ste. 5400
Wilmington, DE 19801

Timothy R. Dudderar, Esq.
Callan R. Jackson, Esq.
Hannah L. Paxton, Esq.
Potter Anderson & Corroon LLP
1313 N. Market St.
Wilmington, DE 19801

> RE:  *DRS Family Holdings, Inc. et al. v. Regal Buyer, LLC*,
>    C.A. No. 2025-1452-BWD

Dear Counsel:

This letter opinion resolves a single, narrow issue of contract interpretation—whether a party responding to a fraud claim has an investigation right under the unambiguous language of a membership interest purchase agreement. To resolve this issue, the Court must decide whether the fraud claim, though not limited to an indemnification remedy, nevertheless arises "under" the contract's indemnification provisions. Interpreting the contractual definitions at issue, the Court finds that it does. Summary judgment is therefore entered for the plaintiffs.

## I.     BACKGROUND

### A.     Plaintiffs And Defendant Enter Into A Membership Interest Purchase Agreement Under Which Defendant Purchases A Majority Interest In ResNav.

Resource Navigation LLC ("ResNav") is a Delaware limited liability company that assists customers with managing payroll data after switching payroll providers.    Verified Compl. [hereinafter Compl.] ¶¶ 10, 15, Dkt. 1; Def. Regal Buyer, LLC's Answer to Verified Compl. [hereinafter Ans.] ¶¶ 10, 15, Dkt. 8.  From its inception until 2025, ResNav generated more than three-quarters of its annual revenue from a single customer, "Client A."  *See* Compl. ¶ 16; Ans. ¶ 16; Compl., Ex. F ¶ 25.

Daniel Shaughnessy founded ResNav and, until April 2024, owned all of ResNav's outstanding equity through DRS Family Holdings, Inc. (together with Shaughnessy, "Plaintiffs"), a Massachusetts corporation.     Compl. ¶¶ 9–10, 18; Ans. ¶¶ 9–10, 18.

On April 4, 2024, Plaintiffs and Regal Buyer, LLC ("Defendant") entered into a Membership Interest Purchase Agreement ("MIPA") under which Defendant agreed to purchase 61% of the membership interests in ResNav.  Compl. ¶ 18; Ans. ¶ 18; Compl., Ex. A [hereinafter MIPA] at 1; Compl., Ex. F ¶ 2.

In Article III of the MIPA, Plaintiffs, as the "Seller Parties," made representations and warranties with respect to the absence of certain changes, events, and conditions in ResNav's business; material contracts; and material relationships. *See* MIPA at 1; *id.* §§ 3.11(a), 3.12(b), 3.23(e).

Article IX of the MIPA governs the parties' entitlement to indemnification. *See* MIPA Art. IX. Section 9.01, entitled "Survival," states, in relevant part, that:

> Subject to the limitations and other provisions of this Agreement, the representations and warranties of the Seller and the Buyer contained in this Agreement will survive until the Expiration Date [defined as the one year anniversary of the closing date]; *provided, however*, that . . . any Claims based on fraud and intentional misrepresentation . . . shall survive until the seven (7) year anniversary of the Closing Date . . . .

*Id.* § 9.01 (emphasis in original).[1]

Section 9.02, "Indemnification by Seller Parties," requires Plaintiffs to "indemnify and defend" Defendant, as a "Buyer Party," for:

> Losses[2] incurred or sustained by . . . Buyer Indemnitees based upon, arising out of, with respect to, or by reason of:

---

[1] The MIPA defines a "Claim" to "mean[] any claim, counterclaim, action, cause of action, complaint, charge, notice, suit, proceeding, audit, investigation, arbitration, mediation hearing, or demand of any kind." MIPA Art. I.

[2] The MIPA defines a "Loss" to mean:

> [A]ny and all damages, losses, Liabilities, Encumbrances, penalties, deficiencies, awards, fines, demands, assessments, settlements, judgments, Taxes, costs and expenses, including court costs, accountants' and attorneys' fees and other out-of[-]pocket costs of conducting litigation, and any interest owing, arising out of or levied as a result of any of the foregoing. In addition

(i) any inaccuracy in or breach of any of the representations or warranties of any Seller Party contained in this Agreement;

(ii) any breach, noncompliance or non-fulfillment of any covenant, agreement or obligation to be performed by any Seller Party pursuant to this Agreement;

(iii) any Closing Indebtedness or Closing Transaction Expenses (in each case, to the extent not taken into account in the final determination of the Purchase Price); and

(iv) any matter identified on Section 9.02(a)(iv) of the Disclosure Schedules.

*Id.* § 9.02(a).  Section 9.04, "Certain Limitations," states that "[t]he indemnification provided for in Section 9.02 . . . shall be subject to" certain limitations, including a "Deductible Amount" and "Indemnification Cap" that do "not apply in the event of: . . . fraud or intentional misrepresentation."  *Id.* § 9.04(a)(i)–(ii).

Critical to the present dispute, Section 9.06 includes "Indemnification Procedures."  MIPA § 9.06.  Section 9.06 defines "Indemnified Party" to mean the "party making a Claim under this ARTICLE IX" and an "Indemnifying Party" to mean "the party against whom such Claim is asserted under this ARTICLE IX."  *Id.*

---

to the foregoing, Losses shall include any costs and expenses, including court costs, accountants' and attorneys' fees and other out-of-pocket costs of conducting litigation, actually paid or suffered by an Indemnified Party, whether in connection with a Direct Claim or a Third-Party Claim.

MIPA Art. I.

Section 9.06(c) then sets out procedures to govern a "Direct Claim," which include

the following italicized information right:

> **Direct Claims**. Any Claim by an Indemnified Party on account of a Loss that does not result from a Third-Party Claim[3] (a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party written notice thereof. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such thirty (30) day period, ***the Indemnified Party shall allow the Indemnifying Party and its professional advisers to investigate the matter or circumstance alleged to give rise to the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance*** (including access to the Target's premises and personnel and the right to examine and copy any accounts, documents or records) ***as the Indemnifying Party or its Representatives may reasonably request***. If the Indemnifying Party does not so respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have rejected such Direct Claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

*Id.* § 9.06(c) (emphasis added).

Section 9.07 states that Losses for which indemnification is required from the

Seller Parties "shall be first satisfied":

---

[3] The MIPA defines a "Third-Party Claim" to mean "any Claim made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing." *Id.* § 9.06(a).

(i) first, subject in all respects to (x) satisfaction of the Deductible Amount (if applicable) and (y) the Indemnification Cap (if applicable), and to the extent that the then-remaining "retention" has not been satisfied under the R&W Insurance Policy, then by recovery from the Seller Parties, jointly and severally;

(ii) second, to the extent such Losses are recoverable under the R&W Insurance Policy, by recovery under the R&W Insurance Policy; and

(iii) third, ***only with respect to*** (x) any inaccuracy in or breach of any Fundamental Representation or Statutory Representation in ARTICLE III (but not with respect to any inaccuracy in or breach of any other representation or warranty in ARTICLE III), (y) ***fraud or intentional misrepresentation***, or (z) any claim for Losses pursuant to Section 8.05, ***by recovery from the Seller Parties, jointly and severally***.

*Id.* § 9.07 (emphasis added).

Finally, Section 9.08, "Exclusive Remedies," states in full:

The parties acknowledge and agree that their sole and exclusive remedies with respect to any and all Claims (***other than Claims arising from fraud or intentional misrepresentation*** on the part of a party hereto in connection with the Transactions) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be (i) pursuant to the indemnification and setoff provisions set forth in ARTICLE VIII and this ARTICLE IX, (ii) the resolution of disputes as provided in Section 2.04, or (iii) to obtain specific performance or such other equitable injunctive relief to which such Person shall be entitled. Notwithstanding the foregoing, ***nothing in this Section [9.08] shall limit any Person's right*** to seek and obtain any specific performance or such other equitable or injunctive relief to which any Person shall be entitled or ***to seek any remedy on account of fraud or intentional misrepresentation*** in connection with the Transactions.

*Id.* § 9.08 (emphasis added).

### B. Defendant Accuses Plaintiffs Of Fraud And Plaintiffs Invoke A Contractual Investigation Right.

On October 20, 2025, Defendant sent Plaintiffs a letter alleging "grounds to assert a breach of certain Representations and Warranties contained in Article III of the [MIPA]," and informing Plaintiffs that Defendant "ha[d] submitted a Claim Notice to Palms Specialty Insurance Company, Inc. and certain Underwriters at Lloyd's, London . . . pursuant to the Buyer-Side Representations and Warranties Insurance Policy." Compl., Ex. B at 1.

On October 28, Plaintiffs responded by letter, asserting that Defendant's October 20 letter "fail[ed] to 'describe the Direct Claim in reasonable detail' and fail[ed] to 'indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained,' by the Buyer Parties as required by Section 9.06(c)" of the MIPA. *Id.*, Ex. C at 1–2. Three days later, Defendant replied, denying that its October 20 letter asserted "a Direct claim for indemnification" and claiming instead that its letter was intended as a "legal hold" to notify Plaintiffs to preserve relevant documents. *Id.*, Ex. D at 1.

On November 20, Defendant sent Plaintiffs a demand letter alleging that Plaintiffs had fraudulently misrepresented and omitted information when making

representations in the MIPA about ResNav's relationship with Client A. *Id.*, Ex. E

at 1–3. Defendant's November 20 letter attached a draft complaint to be filed in the

Delaware Superior Court, alleging claims against Plaintiffs for fraud. *See id.*, Ex. F.

On December 4, Plaintiffs responded to Defendant's November 20 demand

letter. *Id.*, Ex. G. In their response, Plaintiffs "unequivocally reject[ed] any and all

allegations that they engaged in fraud," asserted that Defendant's November 20

demand letter constituted a Direct Claim under Section 9.06(c) of the MIPA, and

sought to exercise their information right thereunder. *Id.* at 1, 4–5. To conduct their

investigation, Plaintiffs demanded that Defendant produce documents and make

certain individuals available for interviews. *Id.* at 4. Defendant responded on

December 10, again asserting that its demand letter did not constitute a Direct Claim

under the MIPA. *Id.*, Ex. H at 1.

### C. Procedural History

On December 15, Plaintiffs initiated this action through the filing of a Verified

Complaint (the "Complaint"). Dkt. 1. Count I of the Complaint seeks an order

requiring Defendant to specifically perform its obligations under Section 9.06(c) of

the MIPA by satisfying Plaintiffs' information right thereunder. *Id.* ¶¶ 51–61. Count

II seeks a declaratory judgment that "the November 20, 2025 Demand Letter and

Draft Complaint constituted a notice of a Direct Claim seeking to recover for Losses

associated with alleged breaches of representations and warranties under the [MIPA]" and Plaintiffs "are entitled to conduct a prompt investigation into the matter or circumstances alleged to have given rise to the Direct Claim which includes being provided access to ResNav's personnel and documents." *Id.* ¶¶ 62–67. Count III alleges a claim for breach of Section 9.06(c) of the MIPA. *Id.* ¶¶ 68–76.

On January 15, 2026, the parties cross-moved for summary judgment on all counts of the Complaint (the "Cross-Motions") and submitted opening briefs in support thereof. Pls.' Mot. for Summ. J., Dkt. 11; Pls.' Op. Br. in Supp. of Their Mot. for Summ. J. [hereinafter POB], Dkt. 11; Def.'s Mot. for Summ. J., Dkt. 12; Def. Regal Buyer, LLC's Op. Br. in Supp. of Its Mot. for Summ. J. [hereinafter DOB], Dkt. 12.

On January 16, Defendant filed a complaint in the Delaware Superior Court alleging claims for fraud against Plaintiffs (the "Superior Court Complaint"). *Regal Buyer, LLC v. Shaughnessy*, C.A. No. N26C-01-032 SKR CCLD (Del. Super.); *see* Ltr. Regarding Super. Ct. Action, Dkt. 16; *id.*, Ex. 1.[4]

---

[4] Defendant (the plaintiff in the Superior Court action) requested leave to file the Superior Court Complaint in late December 2025. DOB at 13 n.4. The Superior Court granted that request on January 7, 2026. Order Granting Leave to File Compl. Under Seal, Del. Super. Dkt. 1.

Briefing on the Cross-Motions concluded on February 6. Pls.' Answering Br. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter PAB], Dkt. 24; Def. Regal Buyer, LLC's Answering Br. in Opp'n of Pls.' Mot. for Summ. J. [hereinafter DAB], Dkt. 26. The Court heard oral argument on the Cross-Motions on February 25.

## II.    ANALYSIS

The Court will enter summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c).

Ordinarily, "[w]hen the Court is faced with cross-motions for summary judgment[,] the same standard must be applied to each of the parties' motions and the mere existence of cross-motions does not necessarily indicate that summary judgment is appropriate for one of the parties." *Baring v. Condrell*, 2004 WL 2340047, at *3 (Del. Ch. Oct. 18, 2004). Where, however,

> the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.

Ct. Ch. R. 56(h). Here, the parties have "agree[d] that the issues in the Complaint may be subject to resolution on a paper record through cross-motions for summary judgment with respect to the Complaint[.]" Stipulation and Scheduling Order, Dkt.

6. Even absent that agreement, "[s]ummary judgment is particularly appropriate in a dispute over an unambiguous contract 'because there is no need to resolve material disputes of fact.'" *XO Commc'ns, LLC v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1124 (Del. Ch. 2007) (quoting *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

The sole issue presented on the Cross-Motions is whether Section 9.06(c) of the MIPA entitles Plaintiffs to "information and assistance" to investigate Defendant's fraud claim. To resolve that issue, the Court must interpret the terms of the MIPA. "Absent ambiguity," the Court must interpret contract "terms according to their plain and ordinary meaning." *McKenzie v. BDO USA, P.C.*, 2026 WL 191010, at *3 (Del. Ch. Jan. 26, 2026). "[A] contract is only ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings." *Infab Holdco, Inc. v. Cusick*, 2025 WL 1430771, at *2 (Del. Ch. May 19, 2025) (quoting *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001)). Delaware courts read the "contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *Kuhn Constr. Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

The parties agree that the investigation right in Section 9.06(c) of the MIPA applies when a party asserts a "Direct Claim." *See* MIPA § 9.06(c) ("[T]he Indemnified Party shall allow the Indemnifying Party and its professional advisers to investigate the matter or circumstance alleged to give rise to the Direct Claim . . . ."). The MIPA defines a "Direct Claim" to mean "[a]ny Claim by an Indemnified Party on account of a Loss that does not result from a Third-Party Claim." *Id.* The parties do not dispute that Defendant's fraud claim is a "Claim" on account of a "Loss" that did not result from a "Third-Party Claim."[5] They disagree, however, on whether Defendant's fraud claim has been brought by an "Indemnified Party," defined to mean the "party making a Claim under this ARTICLE IX," and against an "Indemnifying Party," defined to mean "the party against whom such Claim is asserted under this ARTICLE IX." *Id.* § 9.06.

On the one hand, Defendant contends that its fraud claim is not a claim for indemnification under Section 9.02(a), and therefore is not brought "under" Article IX. In making this argument, Defendant relies heavily on Section 9.08, which makes clear that "the indemnification and setoff provisions set forth in ARTICLE VIII and

---

[5] POB at 15; *see* DAB at 8 (acknowledging the elements for a Direct Claim and disputing only that "[Defendant] made no such claim for indemnification under Article IX in its November 20th letter or the draft complaint attached, and therefore, is not an Indemnified Party").

this ARTICLE IX" are not the "sole and exclusive remedies" for "Claims arising from fraud or intentional misrepresentation." *Id.* § 9.08.

Plaintiffs, on the other hand, argue that a claim for fraud, while not limited to an indemnification remedy, nevertheless operates within Article IX. Upon review of Article IX, I agree. Several provisions within Article IX govern claims for fraud and intentional misrepresentation:

- Section 9.01 limits the survival period for the Seller's representations and warranties to the "Expiration Date" (*i.e.*, one year after closing) except for "any Claims based on fraud and intentional misrepresentation[,]" which "shall not expire on the Expiration Date but shall survive until the seven (7) year anniversary of the Closing Date." *Id.* § 9.01.

- Section 9.02 requires each Seller Party to "indemnify and defend each Buyer Party" for Losses "based upon, arising out of, with respect to or by reason of . . . *any* inaccuracy in or breach of any of the representations or warranties," without exception for fraud or intentional misrepresentation. *Id.* § 9.02(a)(i) (emphasis added).

- Section 9.04 sets a deductible and indemnification cap that do not apply "in the event of . . . fraud or intentional misrepresentation." *Id.* §§ 9.04(a), (b).

- Section 9.07 specifies an order in which Losses "for which indemnification is required" must be satisfied. *Id.* § 9.07(iii). As outlined therein, Losses must be satisfied, first, with the deductible amount and subject to the indemnification cap; second, by recovery under an insurance policy if Losses are coverable thereunder; and third, only for "fraud and intentional misrepresentation" (and certain other specified claims), by recovery from the Seller Parties. *Id.*

- Section 9.08 provides that "the indemnification and setoff provisions set forth in ARTICLE VIII and this ARTICLE IX" shall provide the "exclusive remedies" for claims "for any breach of any representation, warranty, covenant, agreement or obligation[,]" with the exception of claims "arising from fraud or intentional misrepresentation." *Id.* § 9.08. Section 9.08 also states that "nothing in this Section [9.08] shall limit any Person's right . . . to seek any remedy on account of fraud or intentional misrepresentation in connection with the Transactions." *Id.*

In other words, Defendant's fraud claim, though not limited to an indemnification remedy, must nevertheless be brought in compliance with the several provisions governing claims for fraud and misrepresentation found within Article IX. Defendant's fraud claim thus arises "under" Article IX, bringing Defendant within the definition of an "Indemnified Party" and Plaintiffs within the definition of an "Indemnifying Party" under the contract.[6] *See Under*, *Black's Law Dictionary* (12th ed. 2024) (defining "under the terms of the agreement" to mean "[a]ccording to; in accordance with; pursuant to"); *see also Pursuant To*, *Black's Law Dictionary* (12th ed. 2024) (identifying "under" as a synonym for "pursuant to," which means "[i]n compliance with" or "in accordance with").

Defendant argues that interpreting the plain language of the MIPA in this manner does not advance the purpose of the investigation right afforded in Section 9.06(c). According to Defendant, the purpose of this right is to enable a party responding to a request for indemnification to investigate the claim's merit "to

---

[6] I acknowledge the apparent dissonance in concluding that a party not seeking indemnification falls within the contractual definition of an "Indemnified Party." But "[p]arties have a right to enter into good and bad contracts, the law enforces both." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). The foregoing analysis enforces the unambiguous contractual terms to which both parties agreed. "Had the parties so intended" to define an Indemnified Party as a party "seeking indemnification" (as opposed to a party "making a claim under . . . Article IX"), "they could have included language having that effect." *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, 1999 WL 160148, at *5 (Del. Ch. Mar. 11, 1999).

determine whether a representation or warranty was unknowingly inaccurate at the time of the transaction and determine whether to dispute the claim or pay the bargained-for capped liability pursuant to the limitations set forth in Article IX." DOB at 24. Defendant argues that an investigation right serves no purpose in a claim for fraud, "where the requisite scienter is distinctly within the knowledge of the accused party." *Id.* Plaintiffs disagree, pointing out that an investigation may uncover "whether the alleged Loss suffered by [Defendant] is attributable to [Plaintiffs], or to [Defendant]'s own actions after the execution of the [MIPA]." PAB at 12. Ultimately, the purpose of the investigation right is not dispositive because the MIPA is unambiguous. Faithful application of the defined terms in the contract compels the conclusion that Defendant's fraud claim is a Direct Claim, *i.e.*, a Claim by an Indemnified Party on account of a Loss that does not result from a Third-Party Claim. Section 9.06 affords a party responding to a Direct Claim an investigation right. This is the contractual regime the parties chose, and "under Delaware law, courts will not rewrite contracts" to change the terms on which the parties agreed. *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *6 (Del. Ch. June 21, 2012).

Separately, Defendant contends that Plaintiffs waived any right to an investigation by "unequivocally reject[ing] any and all allegations that they engaged

in fraud" in their December 4, 2025 response letter.  Under Section 9.06(c), "[t]he Indemnifying Party shall have thirty (30) days after its receipt of such notice [of a Direct Claim] to respond in writing to such Direct Claim[,]" and "[d]uring such thirty (30) day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisers to investigate the matter."  MIPA § 9.06(c).  Defendant argues that by taking a position on the claim before the end of this 30-day period, Plaintiffs waived their right to investigate.[7]

"Under Delaware law, a waiver is 'the voluntary and intentional relinquishment of a known right.'"  *Dirienzo v. Steel P'rs Hldgs. L.P.*, 2009 WL 4652944, at \*4 (Del. Ch. Dec. 8, 2009) (quoting *Realty Growth Invs. v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982)).  "A waiver may be express or implied, but either way, it must be unequivocal."  *Id.* (citing *Rose v. Cadillac Fairview Shopping Ctr. Props. (Del.), Inc.*, 668 A.2d 782, 786 n.1 (Del. Super. 1995)).  I cannot conclude that Plaintiffs "unequivocally" relinquished their right to an investigation by denying they "engaged in fraud," while simultaneously

---

[7] *See* DAB at 17 ("No investigation is necessary for Plaintiffs to determine whether they engaged in fraud or made intentional misrepresentations in connection with the Transactions—the precise claim [Defendant] asserts—as such circumstances are already known to Plaintiffs, and Plaintiffs have already 'unequivocally reject[ed]' the same.").

demanding to exercise such right. *See* Compl., Ex. G at 4 (requesting documents and witness interviews "[t]o begin th[e] [investigation] process").

To enforce their contractual investigation right, Plaintiffs seek an order directing Defendant to specifically perform its obligations under Section 9.06(c) by "giving such information and assistance" as Plaintiffs "may reasonably request" to investigate the fraud claim. Specific performance is "awarded on a discretionary basis by courts of equity." *Morabito v. Harris*, 2002 WL 550117, at *3 (Del. Ch. Mar. 26, 2002). To prove entitlement to specific performance, a movant must demonstrate by clear and convincing evidence that "(1) a valid contract exists, (2) [it is] ready, willing, and able to perform, and (3) . . . the balance of equities tips in favor of [the movant]." *Osborn*, 991 A.2d at 1158.

The parties do not contest that the MIPA is a valid contract, nor that Plaintiffs are ready, willing, and able to perform. Defendant's final objection to an order of specific performance is that the investigation Plaintiffs seek is unreasonable in scope.[8] DAB at 20. In the first instance, the parties are directed to meet and confer on the scope of the investigation. When they do so, the parties should keep in mind

---

[8] *See* MIPA § 9.06(c) (requiring an "investigation by giving such information and assistance . . . as the Indemnifying Party or its Representatives may *reasonably* request") (emphasis added).

that when Plaintiffs served their investigation demand, only 16 days remained in the 30-day window contemplated in Section 9.06. Therefore, the scope of the investigation must be reasonably tailored to occur within a 16-day period.[9]

## III. CONCLUSION

For the reasons explained above, Plaintiffs' motion for summary judgment is GRANTED and Defendant's motion for summary judgment is DENIED.

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor

cc:    All counsel of record (by File & ServeXpress)

---

[9] *See Del. State Troopers' Lodge Fraternal Ord. of Police, Lodge No. 6 v. State*, 1984 WL 8217, at *6 (Del. Ch. June 13, 1984) ("[T]he Court is required to limit the remedy of specific performance to the rights created by the contract."); *Tri State Mall Assocs. v. A.A.R. Realty Corp.*, 298 A.2d 368, 372 (Del. Ch. 1972) (finding movant "entitled to no more than [the contract] provides").