Anthony L. ARCINIAGA,
Plaintiff–Appellee,

v.

GENERAL MOTORS CORPORATION,
Defendant–Appellant.

Docket No. 05–6299–CV.

United States Court of Appeals,
Second Circuit.

Argued: June 12, 2006.

Decided: Aug. 8, 2006.

James C. McGrath, Bingham McCutchen LLP, Boston, MA (Carol E. Head and Diane C. Hertz, on the brief), for Defendant–Appellant.

Steven H. LaBonte, Bellavia Gentile & Associates, LLP, Mineola, N.Y. (Leonard A. Bellavia, Stephen A. Somerstein, and Christine Staiano, on the brief), for Plaintiff–Appellee.

Before McLAUGHLIN and RAGGI, Circuit Judges, and KARAS, District Judge.*

McLAUGHLIN, Circuit Judge.

This case arises from a dispute between Anthony L. Arciniaga and General Motors Corporation ("GM"). The merits of that dispute, however, are not today's concern. Instead, our task is to determine if the Motor Vehicle Franchise Contract Arbitration Fairness Act of 2002 (the "MVFCAFA") limits GM's ability to enforce its arbitration agreement with Arciniaga. The district court found that it does. We find that it does not. Thus, we reverse the district court's denial of GM's motion to compel arbitration and its grant of Arciniaga's motion to stay arbitration.

---

* The Honorable Kenneth M. Karas, of the United States District Court for the Southern District of New York, sitting by designation.

## BACKGROUND

Through its Motor Holdings program, GM co-invests in car dealerships with individuals who lack the capital to open a dealership on their own. GM contributes as much as eighty-five percent of the necessary capital in exchange for the preferred stock of the dealership, which is organized as a corporation. The individual provides the remaining necessary capital in exchange for common stock in the dealership, and assumes responsibility for the dealership's day-to-day operations. If all goes smoothly, the dealership redeems GM's preferred stock through its profits until only the common stock remains, leaving the individual operator as the sole owner of the dealership.

Through the separate but related Minority Dealer Development program, GM provides training and additional financial support to minority Motor Holdings program candidates. GM frequently donates additional capital to dealerships participating in the Minority Dealer Development program in order to reduce the number of preferred shares that the dealerships must ultimately redeem.

At some point in the mid–1990s, GM accepted Arciniaga into the Motor Holdings and Minority Dealer Development programs. GM had already purchased Douglaston Chevrolet–Geo, Inc. (d/b/a Bay Chevrolet), a dealership in Douglaston, New York, from its previous owner. GM and Arciniaga intended that Arciniaga would become the President and eventual sole owner of Bay Chevrolet through the Motor Holdings and Minority Dealer Development programs.

In December 1995, GM, Arciniaga, and Bay Chevrolet entered into a Stockholders Agreement. Pursuant to the terms of the agreement, Bay Chevrolet issued 2,100 shares of common stock and 11,900 shares of preferred stock. GM purchased all of the preferred stock for $1,190,000. Arciniaga purchased Bay Chevrolet's common stock for $210,000, $125,000 of which came from a GM loan. The Stockholders Agreement provided that GM could purchase all of Bay Chevrolet's common stock if at any point the dealership suffered losses that exceeded $280,000. The agreement also provided that all questions concerning its construction, validity, and interpretation were to be governed by New York law.

Around the same time, GM and Bay Chevrolet entered into a separate Dealer Sales and Service Agreement (the "Dealer Agreement"). Every GM dealership enters into this form agreement regardless of whether its operator participates in the Motor Holdings or Minority Dealer Development programs. Under the terms of the Dealer Agreement, GM authorized Bay Chevrolet "to sell and service [GM] products" and promised to supply Bay Chevrolet with motor vehicles and to provide training for the dealership's employees. Bay Chevrolet, for its part, pledged to promote, sell, and service GM products. The Dealer Agreement provided that disputes arising from the agreement should be submitted to non-binding arbitration. The agreement is governed by Michigan law, and GM and Bay Chevrolet renewed it in November 2000. Significantly, Arciniaga is *not* a party to the Dealer Agreement.

In October 1999, for reasons not pertinent to this dispute, GM, Arciniaga, and Bay Chevrolet agreed to a reorganization plan that altered the terms of their investment relationship. Under this plan, they agreed to terminate the 1995 Stockholders Agreement and to enter into a new Stockholders Agreement (the "Amended Stockholders Agreement"). The Amended Stockholders Agreement reduced the loss amount that would trigger GM's right to

purchase Bay Chevrolet's common stock from $280,000 to $200,000.

Both the reorganization plan and the Amended Stockholders Agreement required GM, Arciniaga, and Bay Chevrolet to enter into a binding Arbitration Agreement, which they did in October 1999. By the terms of the Arbitration Agreement, each party waived its right to a jury trial and agreed to submit to mandatory and binding arbitration any claims arising from or related to, *inter alia,* Arciniaga's investment in Bay Chevrolet, the business decisions or practices of any of the parties, and any other agreement entered into by the parties, including any Dealer Sales and Services Agreement executed before or after the Arbitration Agreement. The Arbitration Agreement also provided that the Federal Arbitration Act (the "FAA") governs the interpretation, enforcement, and conduct of the arbitration, but Michigan law governs all matters that the FAA does not cover.

By February 2005, Bay Chevrolet was reporting losses well over $200,000, thereby triggering GM's option to purchase all of the dealership's common stock. In March 2005, GM notified Arciniaga that it was exercising that option. After Arciniaga refused to resign as President of Bay Chevrolet, GM exercised its right to remove him. In June 2005, GM issued Arciniaga a check for the value of the common stock.

In July 2005, Arciniaga sued GM in the United States District Court for the Southern District of New York (Baer, J.). His complaint alleges claims for (1) discrimination in the making or enforcement of contracts in violation of 42 U.S.C. § 1981; (2) violation of the Automobile Dealers Day in Court Act (the "ADDCA"), 15 U.S.C. § 1222; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) breach of the fiduciary duty

owed by a majority shareholder to a minority shareholder; *and* (6) fraud.

In August 2005, GM filed a demand for arbitration with the American Arbitration Association. Arciniaga countered with a motion in the district court for a preliminary injunction staying arbitration. GM filed a cross-motion to compel arbitration and to stay the district court action. The district court granted Arciniaga's motion to stay arbitration and denied GM's motion to compel arbitration. *See Arciniaga v. General Motors Corp.,* 418 F.Supp.2d 374 (S.D.N.Y.2005).

GM now appeals.

## DISCUSSION

GM argues that the district court erred by granting Arciniaga's motion to stay arbitration and denying GM's motion to compel arbitration. We agree.

■■■ We have jurisdiction. The FAA permits interlocutory review of both a denial of a motion to compel arbitration, 9 U.S.C. § 16(a)(1)(C), and a stay of arbitration, *Id.* § 16(a)(2). We review de novo the district court's determination. *LAIF X SPRL v. Axtel, S.A. de C.V.,* 390 F.3d 194, 198 (2d Cir.2004).

■■■ Dating "back to those days when the English judges opposed any innovation that would deprive them of their jurisdiction," *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 24 (2d Cir.1995), courts once possessed a "hostility" towards arbitration agreements, *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Congress passed the FAA to tame that antipathy. *Id.* Now, it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we "have often and emphatically applied." *Leadertex,* 67 F.3d at 25.

■ The FAA provides that an agreement to arbitrate is "valid, irrevocable, and enforceable." 9 U.S.C. § 2. "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Thus, the burden lies with the party attempting to avoid arbitration "to show that Congress intended to preclude a waiver of a judicial forum" for his claims. *Gilmer*, 500 U.S. at 26, 111 S.Ct. 1647 (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)).

■ Here, there is no dispute that Arciniaga and GM entered into a binding arbitration agreement; and there is no denying that their current disagreement falls within the scope of that agreement. The parties do dispute, however, whether Congress intended claims such as Arciniaga's to be nonarbitrable.

Arciniaga claims, and the district court agreed, that the MVFCAFA limits the availability of arbitration in this case. The MVFCAFA, a 2002 amendment to the ADDCA, states:

> Notwithstanding any other provision of law, whenever a motor vehicle franchise contract provides for the use of arbitration to resolve a controversy arising out of or relating to such contract, arbitration may be used to settle such controversy only if after such controversy arises all parties to such controversy consent in writing to use arbitration to settle such controversy.

15 U.S.C. § 1226(a)(2).

By its terms, the MVFCAFA applies only to "motor vehicle franchise contracts." *Id.* The statute does not affect arbitration agreements in other types of contracts, even if they touch on the relationship between an automobile manufacturer and a car dealership. The statute defines "motor vehicle franchise contract" as "a contract under which a motor vehicle manufacturer, importer, or distributor sells motor vehicles to any other person for resale to an ultimate purchaser and authorizes such other person to repair and service the manufacturer's motor vehicles." *Id.* § 1226(a)(1)(B).

At oral argument, Arciniaga's counsel conceded that the complaint alleges only a breach of the Amended *Stockholders* Agreement and not a breach of the *Dealer* Agreement. Moreover, the complaint confirms that the entirety of Arciniaga and GM's dispute relates to their investment relationship, which, of course, is governed by the Amended Stockholders Agreement. The essential question, then, is whether the Amended Stockholders Agreement is a "motor vehicle franchise contract." We conclude it is not.

The Amended Stockholders Agreement is not an agreement by which GM "sells motor vehicles to any other person for resale to an ultimate purchaser." Nor does the agreement authorize anyone "to repair and service" GM motor vehicles. Thus, by its plain and unambiguous language, the MVFCAFA does not apply to the Amended Stockholders Agreement. *See Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) ("[A] court should presume that the statute says what it means."); *see also Pride v. Ford Motor Co.*, 341 F.Supp.2d 617, 621 (N.D.Miss. 2004) (finding that an automobile dealership investment and employment contract was not a "motor vehicle franchise contract").

Congress's decision to define separately within the statute "motor vehicle franchise contract" buttresses our reading of the

plain language of the MVFCAFA. The ADDCA, of which the MVFCAFA is a part, defines "franchise" as "the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract." 15 U.S.C. § 1221(b). This definition is broader than the MVFCAFA's definition of "motor vehicle franchise contract." That Congress elected to separately define "motor vehicle franchise contract" instead of using a preexisting, more broadly defined, term counsels against expansively construing the more narrowly defined term. *Cf. Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)).

Arciniaga suggests two routes to circumvent the plain language of the MVFCAFA. First, he points to the legislative history of the MVFCAFA. Second, he contends that all the agreements involving himself, GM, and Bay Chevrolet should be read as one agreement. These arguments are unavailing.

To be sure, as the district court recognized, some of the MVFCAFA's legislative history lends support to Arciniaga's argument. According to the Senate Judiciary Committee's report, Congress passed the statute because it was concerned that "[m]anufacturers increasingly are inserting mandatory binding arbitration clauses in non-negotiated side contracts with dealers, such as those governing dealer finance disputes." S.Rep. No. 107–266 (2002). Thus, Congress might well have been concerned about situations such as Arciniaga's. Nev-

ertheless, Congress did not capture Arciniaga's plight in the plain and unambiguous language of the MVFCAFA.

When a statute's language is clear, our only role is to enforce that language " 'according to its terms.' " *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, —— U.S. ——, ——, 126 S.Ct. 2455, 2459, 165 L.Ed.2d 526, —— (2006) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)). We "do not resort to legislative history to cloud a statutory text that is clear" even if there are "contrary indications in the statute's legislative history." *Ratzlaf v. United States*, 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (internal quotations and citations omitted)). Because we have determined that the language of the MVFCAFA is clear and unambiguous, we need not—and thus do not—consider the statute's legislative history.

Arciniaga's second argument is equally unavailing. He contends, based on state contract law, that all the agreements between himself, GM, and Bay Chevrolet are part of a "non-severable package," and from that package there emerges a "motor vehicle franchise contract." Resort to state law in this fashion is not unlike trying to fit the step-sister's foot into Cinderella's shoe. Such a practice would likely abandon "motor vehicle franchise contracts" to the vagaries of different states' contract laws, an outcome potentially inconsistent with the "well-recognized inter-

est in ensuring that federal courts interpret federal law in a uniform way." *Williams v. Taylor,* 529 U.S. 362, 389–390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Stevens, J., concurring). In any event, we need not resolve this question.

■ New York law governs the Amended Stockholders Agreement, while Michigan law controls the Dealer Agreement. Under both states' law, multiple agreements may be read as one contract only if the parties so intended, which we determine from the circumstances surrounding the transaction. *See Rudman v. Cowles Commc'ns, Inc.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); *Macomb County Sav. Bank v. Kohlhoff,* 5 Mich.App. 531, 147 N.W.2d 418, 419 (1967). The circumstances here do not evince an intent by the parties to interpret the Amended Stockholders agreement and the Dealer Agreement as one contract.

*First,* the parties to the Amended Stockholders Agreement and the Dealer Agreement are different. The former is between Arciniaga, GM, and Bay Chevrolet while the latter is between GM and Bay Chevrolet. *Cf. Rudman,* 30 N.Y.2d at 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (finding that multiple contracts did not constitute one transaction because, *inter alia,* "the agreements involved formally different parties"); *Skimin v. Fuelgas Co.,* 339 Mich. 523, 64 N.W.2d 666, 668–69 (1954).

*Second,* the contracts are not mutually dependent. The Dealer Agreement is GM's standard dealership agreement, regardless of the financing of the dealership, and it does not necessarily end if the Amended Stockholders Agreement fails.

*Third,* the agreements are separate forms and they do not refer to each other. *Cf. Rudman,* 30 N.Y.2d at 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 ("Although form is not conclusive, that the parties entered into separate written agreements with 'separate assents' rather than a 'single assent' is influential."); *Schonfeld v. Thompson,* 243 A.D.2d 343, 663 N.Y.S.2d 166, 167 (1st Dep't 1997) (finding that written agreements that do not refer to each other are separate contracts); *Forge v. Smith,* 458 Mich. 198, 580 N.W.2d 876, 881 (1998) ("Where one writing references another instrument for additional contract terms, the two writings should be read together.").

*Finally,* the agreements serve separate purposes. The Dealer Agreement governs the resale and servicing of GM vehicles by Bay Chevrolet (quintessential attributes of a "motor vehicle franchise contract"). The Amended Stockholders Agreement pertains to Arciniaga's and GM's investment relationship in Bay Chevrolet. *Cf. Schonfeld,* 663 N.Y.S.2d at 167 (agreements "serving different purposes" are not a single contract); *Shirey v. Camden,* 314 Mich. 128, 22 N.W.2d 98, 101 (1946).

## CONCLUSION

Arciniaga's brief bristles with a jeremiad about "small businessmen and businesswomen" compared to "large powerful multinational automobile manufacturers." He suggests that if we reverse the district court's decision, the proverbial little guy will not get his day in court. Of course, our decision today does no such thing. Arciniaga's claims will be heard, but they will be heard in the forum he agreed to and not in the forum he bargained away. *See Mitsubishi Motors Corp.,* 473 U.S. at 628, 105 S.Ct. 3346 ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.").

For the foregoing reasons, we reverse the district court's denial of GM's motion

to compel arbitration and its grant of Arciniaga's motion to stay arbitration. The case is remanded to the district court to grant GM's motion to compel arbitration.