# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GIESECKE+DEVRIENT MOBILE SECURITY AMERICA, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0664-PAF |
| NXT-ID, INC., | ) ) ) | |
| Defendant. | ) ) ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: December 30, 2020
Date Decided: March 16, 2021

Lewis H. Lazarus, K. Tyler O'Connell, Bryan Townsend, MORRIS JAMES LLP, Wilmington, Delaware; Aryeh S. Portnoy, Emily Alban, CROWELL & MORING LLP, Washington, DC; *Attorneys for Plaintiff Giesecke+Devrient Mobile Security America, Inc.*

S. Mark Hurd, Alexandra M. Cummings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael T. Sullivan, David E. Danovitch, Clark A. Freeman, SULLIVAN & WORCESTER LLP, New York, New York; *Attorneys for Defendant Nxt-ID, Inc.*

**FIORAVANTI, Vice Chancellor**

This case involves a dispute over the payment of dividends on a series of preferred stock of a Delaware corporation. The applicable certificate of designations provides for a 5% dividend rate, which shall increase to 15% if the corporation's market capitalization is $50 million for greater than thirty consecutive days. The central substantive question is whether, once triggered, the 15% dividend rate continues into perpetuity.

Plaintiff Giesecke+Devrient Mobile Security America, Inc. ("G+D" or "Plaintiff") is the only stockholder that owns the preferred stock at issue. Plaintiff contends that the 15% dividend rate was triggered in January 2018. Defendant Nxt-ID, Inc. ("Nxt-ID" or the "Company") acknowledges that the 15% dividend rate was triggered at some time during the first quarter of 2018. The Company later paid an amount to Plaintiff covering a dividend at the 15% rate for the first quarter of 2018, but for all subsequent quarters, the Company paid dividends at the 5% rate. The Company interprets the certificate of designations as providing for a 15% dividend rate only in quarters where the Company's market capitalization is $50 million for greater than 30 consecutive days. Plaintiff insists that once the dividend rate increases to 15% it forever remains at that level.

Plaintiff has moved for summary judgment. Before considering the central substantive issue, however, the Court must address a jurisdictional question. The Company has moved to dismiss for lack of proper venue. The Company argues that

2

a 2017 merger agreement, to which Plaintiff is a party, designates New York courts as the exclusive forum for this dispute. This opinion denies the Company's motion to dismiss and grants the Plaintiff's motion for summary judgment.

## I. FACTUAL BACKGROUND[1]

Nxt-ID and G+D are Delaware corporations engaged in the business of mobile technology. *See* Declaration of Vincent S. Miceli, dated Sept. 30, 2020 (the "Miceli Decl. I") ¶ 3; Compl. ¶¶ 7–9. In May 2017, Nxt-ID entered into an Agreement and Plan of Merger (the "Merger Agreement") for the acquisition of Fit Pay, Inc. ("Fit Pay"). *See* Miceli Decl. I ¶¶ 4, 6, & Ex. A. Pursuant to the Merger Agreement, Fit Pay merged with and into Nxt-ID's wholly owned subsidiary, Fit Merger Sub, Inc. ("Merger Sub"), and Fit Pay became a wholly owned subsidiary of Nxt-ID (the "Merger"). *See* Miceli Decl. I ¶ 5; Merger Agmt. § 2.1.

Plaintiff had been a Fit Pay stockholder prior to the Merger. The Merger Agreement provided for the exchange of some of Plaintiff's Fit Pay preferred stock for 2,000 shares of Series C Non-Convertible Voting Preferred Stock in Nxt-ID (the "Series C Preferred"). Merger Agmt. § 2.3(a)(ii). The Series C Preferred was a new series of Nxt-ID stock created specifically for Plaintiff as part of the Merger. *See* Miceli Decl. I ¶¶ 7–8. Its terms were negotiated as part of the Merger. *See* Miceli

---

[1] The facts are taken from the pleadings, documents integral thereto, and exhibits to the parties' respective motion papers.

Decl. I ¶ 9.  The exchange of a portion of Plaintiff's Fit Pay preferred stock for Series C Preferred of Nxt-ID was a condition to closing.  Merger Agmt. § 9.7.  Plaintiff was a party and signatory to the Merger Agreement for limited purposes.  Merger Agmt. 1, 41; *see id.* Art. III (excluding G+D from the representations and warranties of the Sellers and the Company).

The Merger Agreement is governed by New York law.  Merger Agmt. § 12.7.  The Merger Agreement also contains a forum selection provision or "FSP," which is central to the parties' dispute.  The FSP states that the parties would "not bring any action relating to this [Merger] Agreement *or any transaction contemplated hereby* in any court other than the Federal District Court for the Southern District of New York or any New York State Court."  Merger Agmt. § 12.11 (emphasis added).  The Certificate of Merger was executed on May 23, 2017 and became effective when it was filed with the Delaware Secretary of State on May 26, 2017.  Declaration of Vincent S. Miceli, dated Nov. 6, 2020 ("Miceli Decl. II") ¶ 21; Merger Agmt. § 2.4.

On May 23, 2017, Nxt-ID filed the Nxt-ID, Inc. Certificate of Designations, Preferences and Rights of Series C Non-Convertible Voting Preferred Stock (the "Certificate of Designations") with the Delaware Secretary of State and issued 2,000 shares of Series C Preferred to G+D.  Compl. Ex. A.  The Series C Preferred "may be redeemed by the Company in cash at any time." *Id*. § 6.  The pertinent provisions of the Certificate of Designations governing dividends are as follows:

4

4.    DEFINITIONS

. . .

(f) "Dividend Rate" means five percent (5%) per annum. In the event that the Company's market capitalization is $50,000,000 for greater than thirty (30) consecutive days, then the Dividend Rate shall increase to fifteen percent (15%) per annum.

. . .

(l) "Stated Value" means $1,000.00 per share . . . .

. . .

5. DIVIDENDS. From and after the Original Issue Date, each holder of a share of Series C Preferred Stock shall be entitled to receive dividends (the "Dividends") which Dividends shall be paid by the Company out of funds legally available therefor, payable, subject to the conditions and other terms hereof, in cash on the Stated Value of such share of Series C Preferred Stock at the Dividend Rate, which shall be cumulative and shall continue to accrue whether or not declared and whether or not in any fiscal year there shall be net profits or surplus available for the payment of dividends in such fiscal year. Dividends on the Series C Preferred Stock shall commence accumulating on the Original Issue Date and shall be computed on the basis of a 360-day year, 30-day months Dividends shall be payable quarterly on the following dates (each, a "Dividend Date"): (1) the first (1st) Dividend Date being October 1, 2017; (ii) the second (2nd) Dividend Date being January 1, 2018; (iii) the third (3rd) Dividend Date being April 1, 2018; and the forth [sic] (4th) Dividend Date being July 1, 2018. Thereafter the dividends shall be paid quarterly on January 1, April 1, July 1, and October 1 of each year. The Company shall pay the Dividends in cash.

*Id*. §§ 4(f), 4(l), 5. The court refers to the definition of Dividend Rate as the

"Dividend Rate Provision."

Nxt-ID made the October 1, 2017 dividend payment on December 15, 2017

and made the January 1, 2018 dividend payment on January 2, 2018. Compl. ¶ 15.

Both payments were made at the 5% dividend rate. *Id*.

5

On December 20, 2017, Nxt-ID's market capitalization was greater than $50 million and remained above that level for the next thirty consecutive calendar days, until January 18, 2018 and, according to Plaintiff, for another 11 days thereafter. *Id.* ¶ 16. On January 23, 2018, Kevin Fitzgerald, a G+D Vice President, sent an email to Nxt-ID's then-chief financial officer (now chief executive officer) Vincent Miceli, stating: "Our records indicate that NXT-ID's market cap remained over $50m for 30 consecutive days. This being the case, G+D's dividend on the preferred shares has increased from 5% to 15%. Please confirm this is your understanding and that the next dividend payment on April 1 will reflect the new rate." Declaration of Bryan Townsend, dated Sept. 15, 2020 (the "Townsend Decl.") Ex. 3.

Miceli responded a few hours later: "Yes, this is my understanding as well. The only question that I have is will the first quarter 2018 dividend amount be computed using a blended dividend rate or will it be based on the full 15% for the entire first quarter. I will check with our legal counsel for their interpretation on this and I will let you know." *Id.*

On April 4, 2018, Plaintiff received a dividend payment for the first quarter of 2018 in the amount of $25,000, which reflected a dividend rate of 5%, not 15% as Plaintiff anticipated. *Id.* Fitzgerald sent an email to Miceli that day noting the discrepancy. Miceli responded that Nxt-ID would review the calculation. *Id.* On April 19, 2018, Miceli followed up with Fitzgerald in an email that retreated from

6

his position on January 23, 2018: "We revisited the calculation and co firmed [sic] that the market cap exceeded $50 mil for 27 consecutive days only and the agreement calls for 30 days in a row." *Id*. Miceli did not identify the specific days to which he was referring or provide any support for the Company's calculation.

The record does not reflect any further communications between the parties about the dividend dispute until May 29, 2019, when Fitzgerald sent a letter to Nxt-ID demanding payment for dividend arrearages from April 1, 2018 to April 1, 2019. Townsend Decl. Ex. 4. Fitzgerald's letter included two tables that he said reflected the Company's daily market capitalization as reported by Bloomberg over two date ranges. One table showed a closing market capitalization above $50 million each day from December 20, 2017 through January 29, 2018 (41 calendar days/26 trading days). The other table showed a closing market capitalization above $50 million each day from February 8, 2018 through March 26, 2018 (47 calendar days/32 trading days). Fitzgerald's letter stated that "thirty (30) consecutive days" in the Dividend Rate Provision means calendar days, not business days.[2] It further noted that even if the provision were to be interpreted as 30 consecutive business days, the 15% dividend rate was triggered as of March 23, 2018. Fitzgerald demanded

---

[2] Fitzgerald's letter uses the term "business days," not "trading days," even though both are defined terms in the Certificate of Designations.

payment of $50,000 in dividend deficiencies for each quarter from April 1, 2018 through April 1, 2019 in a total amount of $240,000. *Id.*[3]

The parties' dividend dispute was due, in part, to a discrepancy between the Company's calculation of its market capitalization versus that reported on Bloomberg. *See* Townsend Decl. Ex. 2 (July 10, 2019 email from Fitzgerald to Miceli). On July 16, 2019, Miceli sent an email to Fitzgerald attaching a spreadsheet described as the Company's "daily market capitalization computations based on the actual number of Nxt-ID shares being issued and outstanding by day." *Id.* The Company's computations reflect that Nxt-ID's market capitalization was greater than $50 million at the close of each trading day from December 20, 2017 through January 29, 2018 (41 calendar days/26 trading days), and again from February 8, 2018 through March 27, 2018 (48 calendar days/33 trading days).[4]

Prior to the July 2019 email exchange between Fitzgerald and Miceli, the Company transmitted $50,000 to Plaintiff "to cover the full 15 percent dividend" for

---

[3] G+D demanded $40,000 for the first quarter of 2018. G+D determined this amount by applying a 5% dividend rate from January 1, 2018 through January 18, 2018 and a 15% rate for the remainder of the quarter, which reflects the 15% dividend rate becoming effective on January 19, 2018.

[4] In the exhibit submitted to the court, these time periods are shaded in green, and the second timespan contains an additional column indicating the number of consecutive trading days. It is unclear whether this highlighting was reflected in the original version that Miceli sent to Fitzgerald, or whether Plaintiff added the highlighting for purposes of this litigation. *See* Townsend Decl. Ex. 2.

the first quarter of 2018.  Miceli Decl. II ¶ 23.  Other than that make-up payment, the Company has continued paying dividends at the rate of 5% per annum.

In an August 26, 2019 letter to the Company, Plaintiff declared that Nxt-ID was "in default" under the terms of the Certificate of Designations.  Townsend Decl. Ex. 5.  The letter demanded payment of $240,000 in underpayment of dividends and $2,000,000 for the stated value of Plaintiff's Series C Preferred.[5]  The letter demanded payment in full by September 10, 2019.

Plaintiff filed the Complaint on August 12, 2020, seeking a declaratory judgment and damages for breach of contract.  Plaintiff has moved for summary judgment, and the Company has moved to dismiss.  The parties have briefed both motions, and the court heard argument on December 30, 2020.

## II.   ANALYSIS

The analysis begins with consideration of the Company's motion to dismiss for improper venue.  If the Company prevails on that motion, the Court does not reach Plaintiff's motion for summary judgment.

### A.   The Company's Motion to Dismiss

"Delaware honors contractual choice of forum provisions.  Thus, under Rule 12(b)(3), a court will grant a motion to dismiss for improper venue based upon a

---

[5] There is no provision for "default" in the Certificate of Designations, and Plaintiff's request for relief in this action does not seek an order compelling redemption of its Series C Preferred.

9

forum selection clause where the parties use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action." *PPF Safeguard, LLC v. BCR Safeguard Hldg., LLC*, 2010 WL 2977392, at *5 (Del. Ch. July 29, 2010) (internal quotation marks omitted); *see Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) ("The courts of Delaware defer to forum selection clauses and routinely give effect to the terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual designation.") (internal quotation marks omitted); *Del Pharm. v. Access Pharm.*, 2004 WL 1631355, at *5 (Del. Ch. July 16, 2004) ("If a forum selection clause validly limits a plaintiff to a single forum, that clause operates to divest a court that otherwise has jurisdiction of its status as a proper venue for the plaintiff to sue.").

"The scope of a valid forum selection clause derives from its language. Accordingly, normal tenets of contract interpretation apply." *Bonanno v. VTB Hldgs., Inc.*, 2016 WL 614412, at *9 (Del. Ch. Feb. 8, 2016) (citations omitted). Because the Merger Agreement is governed by New York law, that law governs the issue of whether the FSP extends to the claims in this case. *See Germaninvestments AG v. Allomet Corp.*, 225 A.3d 316, 331 (Del. 2020) ("When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract.") (quotations omitted);

*Bonanno*, 2016 WL 614412, at \*5–6 (holding New York law governed the construction and interpretation of a forum selection provision invoked by defendant in support of a motion to dismiss). Neither party seriously disputes that New York law governs the construction, interpretation, and application of the FSP to the claims in this case.[6]

The Company argues that the FSP applies to Plaintiff's claims in this action. The FSP provides, in pertinent part: "[E]ach of the parties hereto . . . agrees that it will not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the Federal District Court for the Southern District of New York or any New York State Court." Merger Agmt. § 12.11. The Company argues that the payment of dividends on the Series C Preferred was a transaction contemplated by the Merger Agreement. Accordingly, the Company insists that

---

[6] Plaintiff states in a footnote to its answering brief that whether Delaware or New York law applies to this issue "is not clear," but asserts that "which law the Court applies here does not matter because New York and Delaware law are not materially different with respect to the questions posed herein." Pl.'s MTD Ans. Br. 9 n.2. Plaintiff's bare reference to the issue in a footnote is insufficient to raise it for the court's consideration. "[S]tandalone arguments in footnotes are usually not considered fairly raised in any court." *Sabree Env't & Constr., Inc. v. Summit Dredging, LLC*, 149 A.3d 517 (Del. 2016) (TABLE); *see also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 142 n.33 (Del. Ch. 2004) (declining to consider plaintiff's argument that was raised in a footnote in its answering brief in opposition to a motion to dismiss but was not raised elsewhere).

Plaintiff's claims for breach of the Certificate of Designations[7] may be pursued only in the New York courts specified in the FSP.

Delaware recognizes that, under New York law, a forum selection provision in one agreement which applies to that agreement and "the transactions contemplated [in the agreement]" is "exportable." *Bonanno*, 2016 WL 614412, at *9–10. That is, the forum selection provision may apply "not only to disputes over the terms of its 'home contract' (i.e., the contract in which it appears)," but also to other disputes. *Id.* at *10.

Both parties rely on *Bonanno* in support of their respective positions. The opinion is instructive in analyzing the extent to which a forum selection provision can migrate from one document to another. Although the facts are dense, the court's analysis demonstrates that the migratory range of these provisions is defined by an objective, practical reading of the text.

In 2014, the plaintiff in *Bonanno* filed an action alleging that an acquisition triggered a mandatory redemption of its preferred stock under an amended certificate of incorporation. Defendant moved to dismiss for improper venue, citing forum selection clauses in several prior documents. One of those documents was a 2010 stock purchase agreement (the "Home Document"). The Home Document, in turn,

---

[7] The Certificate of Designations does not contain a forum selection provision.

provided for a merger that was consummated two weeks later. The forum selection provision in the Home Document applied to "all claims in respect of . . . this Agreement and of *the documents referred to in this Agreement*, and in respect of the transactions contemplated hereby and thereby." *Id*. at *10 (emphasis added).

Defendant mapped alternate pathways to migrate the forum selection provision in the Home Document to the certificate claim. First, defendant argued that the Home Document referenced the merger agreement. The merger agreement did not contain a forum selection provision. The merger agreement referenced a conversion of common stock into preferred and stated that the certificate of incorporation would be amended and restated. The court held that this path did not provide the textual bridge to invoke the forum selection clause in the Home Document. For starters, the merger agreement did not contemplate a redemption of the preferred. Second, even though the redemption of the preferred was described in the amended certificate, the court reasoned that the Home Document's forum selection clause

> cannot reach Plaintiff's claim through that two-step migration—(i) from a document "referred to in" the [Home Document] (the Form of Merger Agreement) to "transactions contemplated" by the Form of Merger Agreement (issuing Series B shares and amending [the] certificate); and (ii) from those two transactions to a transaction contemplated thereby (the redemption)—because the [forum selection] Provision's text does not allow for step (ii). Because the redemption of Plaintiff's shares is conceptually distinct from both issuing those shares and amending [the] certificate, and because the [forum selection] Provision cannot leap-frog to foreign transactions *ad infinitum*, the

13

> [Home Document's] reference to the Form of Merger Agreement does not support dismissal of this action.

*Id*. at *10.

Applied here, *Bonanno*'s analysis demonstrates that the Company cannot build a textual bridge from the Merger Agreement to the Dividend Rate Provision claim.[8] Unlike in *Bonanno*, the FSP does not apply to transactions contemplated by "*documents referred to in*" the Merger Agreement. Rather, it applies only to transactions contemplated by the Merger Agreement. The Merger Agreement does not refer to the Certificate of Designations. It refers to the conversion of certain of G+D's Fit Pay shares into the right to receive the Series C Preferred, which Nxt-ID already was to have issued prior to the Merger Agreement. *See* Merger Agmt. § 9.7. The Merger Agreement does not refer to any of Nxt-ID's or G+D's downstream rights or obligations that exist in perpetuity, or, in the words of *Bonanno*, "*ad infinitum*." G+D's claim is at least two steps removed from the Merger Agreement— the filing of the Certificate of Designations and the later change to the Dividend Rate Provision thereunder.

---

[8] The court in *Bonanno* observed, but did not decide, that a more direct path from the certificate—which was referenced in the Home Document—to a transaction contemplated by the certificate (redemption) "probably supports dismissal" under the forum selection clause. *Id.* at *11. The analysis was also complicated by an intervening reorganization, such that the certificate upon which plaintiff's claim was based was that of a different entity from that referenced in the Home Document. The court did not need to decide that issue, because it found that a forum selection clause in a different document required dismissal of plaintiff's claim.

14

The Company analogizes this case to *U.S. Tsubaki Holdings, Inc. v Este*, 2020 WL 4803155 (N.Y. Sup. Ct. Aug. 17, 2020). In that case, a Delaware limited liability company with a principal place of business in Michigan asserted a variety of claims in New York against four former employees, some of whom had been officers of the company. The plaintiffs acquired the company pursuant to a purchase and sale agreement, which the four former employee defendants signed in various capacities. Three of the former employee defendants were also subject to non-competition and non-solicitation provisions contained in the purchase and sale agreement. In connection with the purchase and sale agreement, the defendants entered into employment contracts with the company, which did not contain forum selection clauses. Plaintiffs later terminated the four defendants and filed a complaint in New York state court which included claims for breach of fiduciary duty and breach of the employment agreements. In their motion to dismiss, the former officers asserted that New York lacked jurisdiction over the claims, because the claims related to employment agreements between Michigan-based parties, and any harm occurred in Michigan. Plaintiffs contended jurisdiction was proper because the purchase and sale agreement contained an exclusive New York choice-of-forum clause for "any suit . . . arising out of this [purchase and sale] Agreement or any transactions contemplated hereby." *Id*. at *38. The court denied the jurisdictional motion to dismiss. In a relatively short analysis, the court held that the employment

15

agreements were "transactions contemplated by the purchase and sale agreement" because the employment agreements expressly stated that they were "contingent upon, and shall become effective immediately following" the closing, they became effective "pursuant to" the purchase and sale agreement, and they were executed concurrently with the purchase and sale agreement. *Id*.

Unlike in *U.S. Tsubaki*, where the specific employment contracts expressly referenced the purchase and sale agreement, the Merger Agreement here is entirely silent as to the Certificate of Designations or Plaintiff's right to dividends thereunder—an issue that is governed by Delaware law. Furthermore, neither the Certificate of Designations nor the Merger Agreement states that the Certificate of Designations is contingent upon or became effective immediately following closing of the transaction. This case does not fall within the confines of *Tsubaki*.

Even apart from the plain language of the FSP, the Company asserts that Plaintiff is bound to litigate this dispute in New York because the Merger Agreement and the Series C Preferred were entered into "contemporaneously as part of a single transaction." *Albany Ins. Co. v. Banco Mexicano, S.A.*, 1998 WL 730337, at *2 (S.D.N.Y. Oct. 19, 1998). Under New York law, "multiple agreements may be read as one contract only if the parties so intended, which [the court] determines from the circumstances surrounding the transaction." *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 337 (2d Cir. 2006).

16

The Company equates this case to *Atria Retirement Properties, L.P. v. Bradford*, 2012 WL 10008210 (N.Y. Sup. Ct. Aug. 28, 2012), where claims for breach of a limited partnership agreement were held subject to a forum selection clause contained in a subscription agreement. That clause required "any dispute arising under the subscription agreement or in connection herewith" to be brought in Florida. *Id.* at \*3. The forum selection clause was held to apply because the limited partners expressly agreed in the subscription agreement "to be bound by all of the terms and conditions of the offering made by the Partnership Agreement." *Id.* The court reasoned that because the subscription agreement and partnership agreement were "written instruments between the same parties concerning the same subject matter [and were] contemporaneously executed, they will be read and interpreted together." *Id.* at \*4 (quoting *Greene's Ready Mixed Concrete Co. v. Fillmore Pac. Assocs. L.P.*, 808 F. Supp. 307, 311 (S.D.N.Y. 1992)).

The factors that persuaded the *Atria*[9] court to apply the forum selection provision in the stock purchase agreement to the partnership agreement are not satisfied in this case. First, the parties to the Merger Agreement and the Certificate of Designations are different. The former is among Nxt-ID, Merger Sub, Michael Orlando, G+D and Other Holders of Fit Pay, while the latter is a certificate governing

---

[9] A Westlaw search did not reveal *Atria* as having been cited in any other opinion.

17

the terms of Nxt-ID's Series C Preferred held by G+D. Second, the Merger Agreement and the Certificate of Designations are different documents that do not refer to each other. Third, the Merger Agreement and Certificate of Designations serve separate purposes. The Merger Agreement governs the terms of the merger by which Nxt-ID acquired Fit Pay. The Certificate of Designations governs the terms of the Series C Preferred in Nxt-ID. In short, the documents serve different purposes. *See Arciniaga*, 460 F.3d at 327 (holding arbitration clause in one contract did not apply to a related agreement because the parties to the two contracts were different, and the agreements were not mutually dependent, did not reference each other, and served different purposes). The other authorities upon which the Company relies are similarly inapposite. *See Albany Ins. Co.*, 1999 WL 533792, at *2 (affirming that a dispute concerning warehouse receipts was subject to forum selection clauses contained in loan notes, which specified that each loan note was issued simultaneously with a warehouse receipt that had an identical identification number and that presentation of both the loan note and its corresponding receipt— with a limited exception—was necessary to obtain delivery of the goods); *Nebgen v. Schentag*, 2020 WL 1529452 (S.D.N.Y. Mar. 31, 2020) (holding multiple claims relating to three contemporaneously executed agreements between the parties were subject to the exclusive forum clause designating Switzerland for disputes where all

18

three agreements were governed by Swiss law and the agreement that did not contain a forum selection clause cross-referenced one of the other agreements).

This result is also evident when considering the phrase "transactions contemplated hereby" within the entire context of the Merger Agreement. The phrase is used throughout the Merger Agreement. *See, e.g.*, Merger Agmt. at 1 (second Whereas clause) ("[T]he respective Boards of Directors or Managers, as applicable, of Parent, Merger Sub, and the Company have approved this Agreement, the Merger, and the other transactions contemplated by this Agreement."); *id*. (third Whereas clause) ("[E]ach of Parent, Merger Sub, and the Company desires to make certain representations, warranties, covenants and agreements in connection with the Merger and the other transactions contemplated by this Agreement and also to prescribe various conditions to the consummation thereof."); *id*. § 3.2(a) (representations and warranties) ("The Company has full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby."); *id*. § 3.16(j) ("The Company is in compliance with all terms and conditions of all Tax exemptions, or order of a foreign government with respect to taxes and the transactions contemplated by this Agreement shall not have any adverse effect on the continued validity and effectiveness of any such Tax exemptions or orders."); *id.* § 3.22 ("Except as disclosed [on the relevant schedule of disclosures] none of the Company or any of the Company's directors, officers,

19

employees, consultants, advisors or agents, nor any Seller has employed or incurred any Liability to any broker, finder or agent with respect to this Agreement, the Transaction Documents and the transactions contemplated hereby."); *id.* § 5.4 (Purchase representations and warranties) ("There are no actions, litigations, claims . . . involving the Purchaser . . . that would be reasonably likely to prevent consummation of the transactions contemplated by this Agreement."); *id*. § 6.7 (covenants) ("Upon the reasonable request of the Purchaser, each of the Sellers hereto shall use commercially reasonable efforts to do, execute . . . and deliver all such further acts . . . as may be reasonably required or appropriate to carry out the transactions contemplated by this Agreement, subject to applicable Law."); *id*. § 8.5 (conditions to closing) ("Purchaser shall have received . . . such agreements, documents, instruments and certificates as shall be reasonably requested by Purchaser to consummate the transactions contemplated hereby and to convey to Purchaser all of the Shares as contemplated herein . . . .").

It is not enough to argue that a claim for violation of the Certificate of Designations is a transaction contemplated by the Merger Agreement simply because the Merger Agreement is the factual predicate, or "but for" cause of the claim. *See Ruggiero v. FuturaGene, plc*, 948 A.2d 1124, 1138 (Del. Ch. 2008) ("[N]o reasonable reading of the contract as a whole leads to the conclusion that [defendant] consented to jurisdiction in Delaware [for] . . . claims that are tangentially related to

20

the Merger Agreement, arising years after entry into the Merger Agreement, and susceptible to no relief under the terms of the Merger Agreement."). When placed in proper context of the Merger Agreement as a whole, the phase "transactions contemplated hereby" means transactions contemplated in order to effectuate the merger. The court concludes that Plaintiff's claims are not within the scope of the FSP. Therefore, the Company's motion to dismiss is denied.[10]

## B. Plaintiff's Motion for Summary Judgment

Summary judgment will be granted if the moving party demonstrates that there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56. "Summary judgment is particularly appropriate where the issue is the construction of a legal document such as a certificate of incorporation." *Smith v. Nu-West Indus., Inc.*, 2000 WL 1641248 (Del. Ch. Oct. 25, 2000) (calculating dividends as a matter of law and granting summary judgment). Disputes over the proper construction of a certificate of designations are frequently resolved on summary judgment. *See, e.g., PWP Xerion Hldgs. III LLC v.*

---

[10] Because the court concludes that the FSP is inapplicable, the court does not address Plaintiff's argument that enforcing the FSP under these circumstances would be contrary to public policy embedded in the Delaware General Corporation Law. *See* Pl.'s MTD Ans. Br. 15–16 (citing 8 *Del. C.* § 115 ("no provision in the certificate of incorporation or the bylaws may prohibit bringing [internal corporate claims] in the courts of this State"), and 8 *Del. C.* § 111 (conferring jurisdiction in the Court of Chancery to interpret the certificate of incorporation)); *but see Bonanno*, 2016 WL 614412, at *15 (holding, based on the synopsis of the bill enacting Section 115, that the statute would not preclude enforcement of a clear forum selection clause).

*Red Leaf Res., Inc.*, 2019 WL 5424778 (Del. Ch. Oct. 23, 2019); *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997 (Del. Ch. Apr. 29, 2005); *Halifax Fund LP v. Response USA Inc.*, 1997 WL 33173241 (Del. Ch. May 13, 1997).

The construction and interpretation of the certificate of designations of a Delaware corporation is governed by Delaware law. *VantagePoint Venture P'rs 1996 v. Examen*, 871 A.2d 1108, 1116 (Del. 2005) (holding that a Delaware corporation's certificate of designations must be adjudicated "exclusively in accordance with the law of its state of incorporation, . . . the law of Delaware"). "The rules of construction which are used to interpret contracts and other written instruments are applicable when construing corporate charters and certificates of designation." *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 600 (Del. 2008). "Thus, if the [certificate's] language is clear and unambiguous, it must be given its plain meaning." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del. 2006); *see also Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241 (Del. Ch. May 13, 1997) (deciding dispute over interpretation of certificate of designation on summary judgment). If a contract's terms are unambiguous, the contract's "'plain meaning alone dictates the outcome.'" *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008)

(quoting *Chambers v. Genesee & Wyo. Inc.*, 2005 WL 2000765, at \*5 (Del. Ch Aug. 11, 2005)).

"The 'determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law.'" *Comet Sys., Inc. S'holders' Agent*, 980 A.2d at 1030 (quoting *NBC Universal*, 2005 WL 1038997, at \*5). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996). A contract "is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. . . . [T]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id*. (citations and quotations omitted). "Delaware adheres to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." *NBC Universal*, 2005 WL 1038997, at \*5.

If "the plain language of the relevant terms of the [contract] gives rise to only one reasonable meaning," summary judgment is appropriate. *In re NextMedia Inv'rs, LLC*, 2009 WL 1228665, at \*1 (Del. Ch. May 6, 2009). "Delaware courts will not destroy or twist contract language under the guise of construing it . . . the writing itself is the sole source for gaining an understanding of intent." *PWP Xerion Hldgs.*, 2019 WL 5424778, at \*8.

23

At the center of the summary judgment motion is the construction of the Dividend Rate Provision. It provides that if Nxt-ID's "market capitalization is $50,000,000 for greater than thirty (30) consecutive days, then the Dividend Rate shall increase to fifteen percent (15%) per annum." Compl. Ex. A § 4(f). Plaintiff argues that: (1) "days" means calendar days and (2) once the Dividend Rate increases to 15% per annum, it continues at that rate into perpetuity. Plaintiff maintains that the 15% rate increase was triggered on January 19, 2018, when the Company's market capitalization had remained above $50 million for more than 30 consecutive days (December 20, 2017 to January 18, 2018). Plaintiff contends that the Company's market capitalization was also greater than $50 million for more than 30 consecutive days (calendar and trading) from February 8, 2018 to March 26, 2018. *See* Townsend Decl. Ex. 4.

The Company argues that Plaintiff's reading of the Dividend Rate Provision is not the only reasonable interpretation. According to the Company, there is another, "eminently reasonable" reading of the provision: "the higher dividend rate applies only to those quarters during which the market capitalization meets or exceeds the $50,000,000 threshold for greater than 30 consecutive days." Def.'s S.J.

Ans. Br. 7.[11]  The Company also urges the court to construe "days" to mean "trading days."

### 1.    Calendar Days or Trading Days?

Nxt-ID does not dispute that its market capitalization[12] remained above $50 million for the period between December 20, 2017 and January 29, 2018, which is more than thirty consecutive calendar days.  *See* Miceli Decl. II Ex. C; Townsend Decl. Ex. 2.  Nxt-ID also concedes that its "market capitalization remained above the 50,000,000 threshold for more than 30 consecutive days—trading or calendar—[in] the first quarter of 2018."  Miceli Decl. II ¶ 22; *see* Townsend Decl. Ex. 2 (Feb. 8, 2018–Mar. 27, 2018 (33 trading days)).  To be sure, the Company acknowledges that it "made an additional $50,000 payment to Plaintiff to cover the full 15 percent dividend for that quarter."  Miceli Decl. II ¶ 23.[13]

---

[11] The Company asserts that its interpretation "allows Plaintiff to share in the fruits of Nxt-ID's success and incentivizes Nxt-ID to redeem the Series C Preferred and repay Plaintiff's investment in the Company when Nxt-ID is performing well (as reflected in its market capitalization)."  Def.'s S.J. Ans. Br. 7.  This argument seems to have the incentive backwards.  Construing the Dividend Rate Provision to provide for a perpetual 15% dividend rate upon being triggered is what incentivizes the Company to redeem the preferred stock, so as to both provide Plaintiff with liquidity and to allow the Company to avoid the continuing obligation to pay an extremely high dividend payment into perpetuity.

[12] Both parties calculate market capitalization by multiplying the number of outstanding shares by the closing stock market price of a share of Company stock.  The parties do not reach the same results, however, because they use differing figures for the total outstanding shares. *Compare* Townsend Decl. Ex. 2, *with* Miceli Decl. II Ex. C.

[13] The daily calculation of the Company's market capitalization attached as Exhibit C to the Miceli Declaration II is inconsistent with Miceli's statements in paragraphs 22–23 of his Declaration.  Exhibit C reflects a market capitalization in excess of $50 million for only

The Company argues that construing "thirty (30) consecutive days" to mean calendar days "makes no sense . . . because market capitalization can only be calculated on trading days." Def.'s S.J. Ans. Br. 5. The Company's brief does nothing further to support its position, and its counsel did not address it at oral argument. Plaintiff counters that while it is "true that a company's market capitalization does not *change* on non-trading days, as the share price does not change on such days, . . . it is not true that it does not exist or cannot be calculated. . . . A company's market capitalization on any non-trading day is simply the same as its market capitalization on the most recent trading day." Pl.'s S.J. Reply Br. 9–10 (emphasis in original). I agree.

First, the Company's argument is contrary to the plain language of the Certificate of Designations. To accept the Company's interpretation, the court would need to insert the term "trading" between "consecutive" and "days." This Court will not insert terms that do not exist in the contract. *Murfey v. WHV Ventures, LLC*, 236 A.3d 337, 355 (Del. 2020) ("[I]t is axiomatic that courts cannot rewrite contracts or supply omitted provisions. Doing so does not respect the parties'

28 consecutive trading days in the first quarter of 2018 (from February 14, 2018 to March 26, 2018). On the other hand, the table of closing prices that Miceli sent to Fitzgerald on July 16, 2019 is consistent with the Miceli Declaration II at paragraphs 22–23, and the Company did not argue that there was any dispute of fact that the Company's market capitalization was greater than $50 million for more than 30 consecutive trading days in the first quarter of 2018. *See* Def.'s S.J. Ans. Br. 5.

26

freedom of contract."); *see also Alpine Inv. P'rs v. LJM2 Cap. Mgmt., L.P.*, 794 A.2d 1276, 1286 (Del. Ch. 2002) ("As a general proposition, for a court to add a limitation that is not found within the express language of the contract is untenable.") (citations omitted).

Second, the parties used the word "days" without qualification in the Dividend Rate Provision. "Day" is commonly understood to mean "[a]ny 24-hour period." Day, *Black's Law Dictionary* (11th ed. 2019). "The word 'days,' when not qualified, means in ordinary and common usage calendar days." *Okanogan, Methow, San Poelis, Nespelem, Coville, and Lake Indian Tribes or Bands of State of Washington v. U.S.*, 279 U.S. 655, 679 (1929) (the Pocket Veto Case).

Third, the Company ignores that the terms "Trading Day" and "Business Day" are defined terms in the Certificate of Designations.[14] If the parties intended the term "day" as used in the definition of "Dividend Rate" to mean Trading Day or Business Day, they could have used those defined terms. Having chosen not to use those defined terms in the definition of Dividend Rate, the parties intended, instead, to use the ordinary plain meaning of "day." Indeed, the parties used the ordinary and common meaning of "day" in defining the terms "Trading Day" and "Business

---

[14] The term "Business Day" is defined as "any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed." Compl. Ex. A § 4(c). The term "Trading Day" is generally defined as any day on which the Company's common stock is traded on the relevant market, and if not listed on a relevant market, then Trading Day "means a Business Day." *Id*. § 4(o).

27

Day." Thus, the Company's interpretation of days as meaning trading days transgresses the well-accepted canon of contract construction that "'absent anything indicating a contrary intent, the same phrase should be given the same meaning when it is used in different places in the same contract.'" *JJS, Ltd. v. Steelpoint CP Hldgs., LLC*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019) (quoting *Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3567610, at *11 (Del. Ch. July 21, 2014)); *see also* 11 Williston on Contracts § 32.6 (4th ed. 1990) ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons."). Reading days to mean trading days would render the defined term "Trading Days" superfluous, thus violating another canon of construction. *See Osborn v. Kemp*, 991 A.3d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.") (internal quotations omitted). Therefore, under the plain language of the Certificate of Designations, the phrase "thirty (30) consecutive days" reflects the parties' intent to mean calendar days.[15]

---

[15] As discussed later in this opinion, the court concludes that, once triggered, the 15% Dividend Rate is perpetual. As a consequence of that determination, the issue of whether "days" means calendar days is of no practical significance to the outcome, because the Company has conceded that the market capitalization satisfied the $50 million threshold for more than 30 consecutive days in the first quarter of 2018, and the Company paid an amount to cover the full 15% dividend for that quarter. Miceli Decl. II ¶¶ 22–23.

## 2. Duration of the 15% Dividend Rate

The Certificate of Designations provides: "In the event that the Company's market capitalization is $50,000,000 for greater than thirty (30) consecutive days, then the Dividend Rate shall increase to fifteen percent (15%) per annum." Compl. Ex. A § 4(f). Plaintiff maintains that this language is unambiguous and mandates a 15% dividend rate into perpetuity after the requisite threshold has been satisfied.

The Company does not contend that Plaintiff's construction of this provision is unreasonable. Instead, the Company insists the provision is ambiguous because another reasonable reading of this provision is that the 15% rate "applies only to those quarters during which the market capitalization meets or exceeds the $50,000,000 threshold for greater than 30 consecutive days." Def.'s S.J. Ans. Br. 7. That contention is not supported by the document.

A contract is not ambiguous merely because the parties disagree on its meaning. *Kaiser*, 681 A.2d at 395. In its search for ambiguity, the Company overlooks the plain language of the Dividend Rate Provision. The Certificate of Designations states that once the threshold is satisfied, "the Dividend Rate shall increase to fifteen percent (15%) per annum." Use of the term "shall" reflects that the increase is mandatory. *See Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *6 (Del. Ch. July 14, 2009) ("[T]he plain meaning of 'shall be advanced' is that advancement is mandatory."); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d

129, 152 (Del. Ch. 2003) ("The word 'shall' is a mandatory term."). Nothing in the language of the Dividend Rate Provision qualifies or otherwise limits the duration of the increase. Had the parties intended to reset the dividend rate to 5% in subsequent quarters and require repeated quarterly satisfaction of the $50 million triggering threshold, they easily could have provided for it.

To accept the Company's interpretation requires the court to rewrite the Dividend Rate Provision in two ways. First, it requires the court to confine the mandatory 15% dividend rate to an arbitrary period—the Company says quarterly. Second, it requires satisfaction of the market capitalization threshold on a quarterly basis. The Dividend Rate Provision does not so provide. The Company advocates a tortured reading of the provision, which leads to absurd results. Consider the following hypothetical scenario: The Company's market capitalization reaches $50 million on the 15th day before the end of any given quarter and remains above that level for the remainder of the quarter and for the first 16 days of the next quarter. Then, on day 17 of the new quarter, the market capitalization falls below $50 million. According to the Company, in that scenario, even though the market capitalization was greater than $50 million for more than 30 consecutive days, the dividend rate would not increase to 15% because the 30-day period was not within a specific quarter. Instead, as the Company would have it, the 15% mandatory dividend rate would not be triggered in this hypothetical unless the market capitalization had

30

continued to remain above $50 million for a full 30 days in the new quarter. Further variations on the hypothetical only magnify the absurdity of the result. At the extreme, the 15% dividend rate would not be triggered if the Company's market capitalization remained above $50 million for the final 29 days of one quarter and the first 29 days of the next quarter, before falling below $50 million on day 30. Applying the Company's interpretation of the Dividend Rate Provision in that scenario, the dividend rate would not increase to 15%, even though the market capitalization was greater than $50 million for 58 consecutive days.

The Company's interpretation is contrary to the plain language of the Dividend Rate Provision and leads to absurd results. Thus, the Company's interpretation of the Dividend Rate Provision is not a reasonable one. *See Osborn*, 991 A.2d at 1160 (observing that "[a]n unreasonable interpretation produces an absurd result"). There is only one reasonable construction of the Dividend Rate Provision: Following any period of thirty consecutive calendar days where Nxt-ID's market capitalization is greater than $50 million, the Dividend Rate is to increase to 15% and remain at 15% for all future dividend payments.

Accordingly, after reaching the $50 million market capitalization threshold under the Certificate of Designations in January 2018, the Dividend Rate increased to 15% per annum for all future dividends. The plain language of the Certificate of

Designations leaves no room for any other interpretation or result. G+D is entitled to a declaratory judgment.

Nxt-ID's failure to pay the full amount of dividends owed to G+D is a breach of the Certificate of Designations. G+D is entitled to damages in an amount reflecting the difference between quarterly dividends computed at the rate of 15% per annum commencing January 19, 2018 and the amount of dividends actually paid to Plaintiff by the Company during that period.[16] Plaintiff is also entitled to pre-judgment interest at 5% over the federal discount rate, compounded quarterly. *See, e.g.*, 6 *Del. C.* § 2301(a); *Narayanan v. Sutherland Glob. Hldgs., Inc.*, 2016 WL 3682617, at *15 (Del. Ch. Jul. 5, 2016) ("In Delaware, pre-judgment interest accrues at the legal rate set forth in 6 *Del. C.* § 2301(a) and is compounded quarterly.").

## III. CONCLUSION

The forum selection provision in the Merger Agreement does not extend to Plaintiff's claim under the Nxt-ID Certificate of Designations. Accordingly, the Company's motion to dismiss for improper venue under Court of Chancery Rule 12(b)(3) is denied. Plaintiff has established that there is no genuine issue of material of fact, and Plaintiff is entitled to a declaratory judgment as a matter of law that the dividend rate under the Certificate of Designations increased to 15% effective

---

[16] According to Plaintiff, as of the filing of the Complaint, the total amount of dividends due to G+D for the prior ten quarters was $740,000.00 and Nxt-ID had paid only $300,000.00. Pl.'s S.J. Opening Br. 13.

January 19, 2018 and did not change at any time thereafter. Plaintiff has established damages and an entitlement to pre-judgment interest at the legal rate, compounded quarterly. The parties are directed to confer on an appropriate form of final order to be submitted within five business days from the date of this opinion.

**IT IS SO ORDERED.**